## In re ROSSER.

(District Court, E. D. Missouri, N. D. August 25, 1899.)

EXAMINATION OF BANKRUPT—CRIMINATING EVIDENCE.

> Under the fifth amendment to the constitution of the United States which declares that "no person * * * shall be compelled in any criminal case to be a witness against himself," where a person is under examination before a referee in bankruptcy he is not obliged to answer questions when he states that his answers might tend to criminate him; and this is true notwithstanding section 7 of the bankrupt act provides that "no testimony given by him shall be offered in evidence against him in any criminal proceeding."

(Syllabus by the Court.)

B. A. Jamison, for trustee.

P. H. Cullen and J. D. Hostetter, for bankrupt.

ROGERS, District Judge. Sidney J. Roy, one of the referees in bankruptcy for the Northern division of the Eastern judicial district of Missouri, certified to this court for its opinion this case, the facts of which are as follows: Rosser was adjudicated a bankrupt, and cited to appear by said referee at New London, in the county of Ralls, state of Missouri, on June 23, 1899, to undergo an examination by the trustee or his attorneys. That Rosser, in pursuance of the citation, appeared, was duly sworn, and in the course of an examination by the said referee testified in substance and to the effect that he had mortgaged a certain piece of property, about 30 days before he was adjudicated a bankrupt, for $2,500, and that he had received the money, and that one Logan, who loaned him the money, counted it out to his attorney, Mr. Cullen, and that Mr. Cullen counted it out to him, the bankrupt; whereupon the following questions were put to him, and the following answers made:

"Q. What was done then? A. We went back in the back room, and counted the money out. Q. Who counted it out? A. Mr. Logan counted it to Mr. Cullen, and Mr. Cullen counted it out to me.. Q. How much was it for? A. $2,500.00. Q. What did you do with it? A. I decline to answer that question. Q. Why do you decline to answer that question? A. Because I have reasons for it. Q. What reasons have you? A. I 'don't wish to state them. I don't care to tell the reasons. Q. Did you pay Mr. Cullen any portion of it? A. No, sir. Q. You are certain of that? A. Yes, sir. Q. Did you pay Mr. Logan any of it? A. No, sir. Q. You are certain of that also? A. Yes, sir. Q. Did you pay anybody else any of it for Mr. Logan? A. No, sir. Q. Did you pay any one any portion of that $2,500.00 for Mr. Cullen? A. No, sir. Q. Have you still that $2,500.00 in your possession? A. I decline to answer any questions about that $2,500.00. Q. Why do you decline to answer them? A. I have a reason for it. Q. What reasons are they? A. Well, the reason is, it might turn up something to criminate me. Q. In what way would it criminate you? A. Well, there are several different ways. Q. What ways are they? A. I don't know. Q. Who told you not to answer that question? A. I don't know as anybody told me not to answer that question. Q. Did Mr. Cullen tell you not to answer? A. No, sir. Q. Did Mr. Hostetter tell you not to answer? A. No, sir. Q. Did you ask him whether you should answer that question, if it should be put to you? A. I don't remember asking him that. Q. Do you swear that you didn't ask him? A. I don't remember what I have asked him. I have asked him several questions. Q. You don't remember? A. No, sir."

Further on in the examination it appeared that, in addition to Mr. Cullen, who was one of the bankrupt's attorneys, the brother of the bankrupt had also employed another attorney, Mr. Hostetter, and the following questions were put to the bankrupt, and the following answers given:

"Q. Did you have any other talk with him after that, up to last night? A. Yes, sir. Q. When and where? A. I met him in Hannibal, and had a talk there, before Mr. Roy. He was there at one time. Q. Did you talk with him about what you should testify to? A. No, sir. Q. Didn't have any talk with him at all? A. I had a talk with him. I never had any talk with him about what I should testify to. Q. Did you ask him as to whether you should answer questions as to the—about the—$2,500.00? Did either one of them tell you that you should refuse to answer questions as to what you had done with the $2,500.00 in case the question was asked you? A. No, sir. Q. Did any one ever tell you that? A. No, sir. Q. Why did you think it might tend to criminate you? A. I have reasons for it. Q. What are your reasons? They are made independent of any suggestions that have been made to you by any party [to] in regard to the matter? A. Yes, sir. Q. Then you decided not to

answer the question without its being suggested to you by any one? A. Yes, sir. Q. Where did you get the idea that it would criminate you? Have you talked with any one about it? A. It would have to start from somewheres. It might as well start from me as anybody. Q. You got it from yourself? A. Yes, sir. Q. By intuition? A. I got it from myself. Q. It was simply from the fact that your own conscience had told you that you had committed some crime, and that you must not answer that question? A. I got it from myself. I hadn't committed any crime, however. Q. Why do you refuse to answer it, then, if you hadn't committed any crime? A. I had my reasons for it. There was other things besides crime. Q. What other things were they? A. I don't know. Q. You state that at Mexico, on the 17th of March, 1899, W. H. Logan paid you $2,500.00 in cash. A. Yes, sir. Q. And that you received it from him. Now, I ask you what you did with that $2,500.00. A. I decline to answer that question. The Referee: You will have to answer the question. The Witness: I am not prepared to answer that question now. The Referee: You will have to answer it. Mr. Jamison: Q. Do you still refuse to answer that question? A. Yes, sir. Mr. Jamison: May it please the court, in view of the fact that this witness has refused to answer the question, or any question, about what he did with the $2,500.00 which was paid to him by Mr. W. H. Logan on the 17th day of March, 1899, I move that this witness be declared in contempt of court, and that all that portion of his testimony commencing with his statement with reference to what he and Cullen and W. H. Logan did after leaving Mexico, also on March 17, 1899, down to the last question asked him, be certified up to his honor, Judge Elmer B. Adams, judge of the district court, for action thereupon, forthwith. (So ordered by the referee.)"

Upon this matter being certified up to the district judge for his opinion, an order was made by the district judge requiring said Rosser to show cause, if any he have, before Hon. John H. Rogers, acting judge of said court, at his chambers in the federal building in the city of St. Louis, Mo., on Monday, the 24th day of July, 1899, at 10 a. m., why he should not be punished as for a contempt. On the 24th day of July the said Rosser appeared, and filed the following answer:

"Now comes the said bankrupt, and, showing cause to the citation in this case, says that he refused to answer the question propounded to him before the referee for the reason that his answer to said question, and to questions of similar import, would have a tendency to show and prove, and would prove, that he is guilty of crimes under the law of the state and United States, and would point out to the public when and where and how to obtain evidence against him showing him to be guilty of criminal acts."

This answer was duly sworn to. It will be observed, in passing, that this answer is directly in conflict with his testimony wherein he says that at the time he refused to answer the question he had not committed any crimes. It is true that at another place in his testimony he stated that to answer the question would tend to criminate him. The question therefore arises as to whether or not the court can compel him, by proceedings for contempt, to show what disposition he has made of the $2,500, which unquestionably belongs to his creditors, and should have been placed in his schedules as a part of the assets of the bankrupt, and turned over to his trustee. Assuming that he has sworn to his schedules as the bankrupt law requires, it must be admitted that, if he were compelled to answer the question, and it should appear that he still has the $2,500, either in his own possession, or has placed it where it is held by some other person for him, but subject to his control, he ought to be indicted, under the bankrupt law, for perjury. If he has not got the money, but has

made way with it in some way, so that it is not under his control, and is not held for him, and he has no interest in it, then he could answer the question without incriminating himself. But it is impossible for the court to determine which state of facts is true. That question can only be determined by his answering the question, and disclosing what he has done with the $2,500. The court is of the opinion that, under such circumstances, to compel him to answer the question is a violation of rights guarantied to him by the fifth amendment to the constitution. See Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195; Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644.

It was urged in argument that he could not avail himself of this provision of the constitution, because, under the seventh section of the bankrupt law, it is expressly provided, "but no testimony given by him shall be offered in evidence against him in any criminal proceeding.", But this language is not half so strong nor half so broad as the language of the act of February 25, 1868 (15 Stat. 37), which was considered, and the same argument made, in the case of Counselman v. Hitchcock, 142 U. S. 560, 12 Sup. Ct. 195, in which case the court held that the witness could not be compelled to answer. That act, as will be seen by an examination of the case of Brown v. Walker, was subsequently amended, and the language of the act made still broader, and yet, when that act came to be considered, it was upheld by a bare majority of the court, four of the judges dissenting, and holding that the witness should not have been compelled to answer the questions. A critical examination of these two cases, I think, justifies the court in the conclusion that the witness in this case ought not to be compelled to answer the question, and may rely upon the constitutional guaranty found in the fifth amendment. The bankrupt, therefore, will be discharged.