BOYD v. GLUCKLICH.

(Circuit Court of Appeals, Eighth Circuit. April 14, 1902.)

No. 1,622.

1. BANKRUPTCY—SUMMARY CHARACTER OF PROCEEDINGS—LIMITATION.

While the bankrupt act authorizes summary proceedings, they must be compatible with the due and orderly administration of justice and conducted with a proper regard for the fundamental rights of the citizen, which rights are not forfeited by the adjudication in bankruptcy; and a referee is not authorized, on petition of a trustee filed at the close of the bankrupt's general examination, to make an order requiring the bankrupt to turn over property, a failure to comply with which will subject him to imprisonment for contempt, without giving him an opportunity to be heard, and a reasonable time to produce evidence, after being advised of the specific claims made by the trustee.

2. SAME—POWERS OF COURTS OF BANKRUPTCY—CONTEMPTS.

Section 41, Bankr. Act 1898, does not invest courts of bankruptcy with broader powers in the matter of punishment for contempt than are possessed by other federal courts; and the mode of proceeding in such courts to determine whether a constructive contempt has been committed should conform to the established practice in like cases in other courts of the United States, as near as may be, and what is legally sufficient to purge a contempt in such other courts is sufficient in a court of bankruptcy.

3. SAME.

A court of bankruptcy cannot lawfully order a bankrupt to deliver to his trustee money or property which is not in his possession or under his control, and imprison him if he fails to comply with such order, which would be in fact an imprisonment for debt, and not for contempt.

4. SAME.

The bankruptcy act makes ample provision for the punishment of a bankrupt for fraudulent concealment of property, or the making of a false oath in relation to the proceedings, by imprisonment on his conviction after a trial by jury, and it also fully protects creditors from the consequences of such fraudulent acts, by making them grounds for the refusal of a discharge; hence there is no sufficient reason to justify a court of bankruptcy in exercising the power to imprison for contempt to compel a bankrupt to turn over money or property to his trustee, in doubtful cases, and before doing so it should be satisfied by the evidence, beyond a reasonable doubt, of the ability of the bankrupt to comply with the order.

Appeal from the District Court of the United States for the Southern District of Iowa.

At some time not disclosed by the record, Morris Glucklich was adjudged a bankrupt by the United States district court, Southern district of Iowa, Central division. There is some confusion of dates in the record, which does not materially affect the case. From one part of the record it appears that on the 23d day of January, 1901, H. E. Boyd, the trustee in bankruptcy, filed with M. J. Hallinan, referee in bankruptcy, a petition requesting the referee to make an order requiring the bankrupt and others to appear before him "forthwith for examination." On the presentation of the petition the referee made an order as requested, and the bankrupt forthwith appeared before the referee and was examined; and pending the examination, or at its close, and while the first meeting of the bankrupt's creditors was still in session, the trustee filed before the referee the following application:

"Comes now H. E. Boyd, the duly elected, qualified, and acting trustee in the foregoing proceedings, and shows to the court that it is apparent from the examination of said bankrupt, Morris Glucklich, at the first meeting of

creditors herein, which meeting is now in session, that said bankrupt has now in his possession and under his control money, goods, and chattels, the property of said estate not turned over to this trustee, as follows:

| | |
|---|---:|
| Cash on hand shown by schedule............................$ | 140 00 |
| Cash in pocket.......................................... | 150 00 |
| Cash with wife.......................................... | 400 00 |
| Cash claimed with Adolph Levy............................ | 1,200 00 |
| Cash claimed with niece, Regena........ ................ | 225 00 |
| Deficiency in stock..................................... | 16,000 00 |
| Expenses credited on cash book, not paid.................. | 1,000 00 |
| Expenses credited twice paid by check..................... | 571 26 |
| Interest paid on homestead mortgage...................... | 53 00 |
| Cash paid for exempt insurance........................... | 95 40 |

Total cash on hand........................$19,834 66

"It also appears from said examination that said bankrupt had in his possession, as the property of said estate, and not exempt, 25 doz. cans of canned goods, and policy of insurance in the Equitable Life Insurance Company, as shown by schedule.

"Wherefore your trustee prays that an order be entered herein at this time requiring said bankrupt to turn over said money, goods, and chattels above described to this trustee within five days."

The record shows that this application was filed at 11:30 a. m., and the record recites that on the motion of the bankrupt the hearing on the application was continued until 2:20 p. m. on the same day, and on the same day, and without any further hearing or examination of the bankrupt or other witnesses, the referee made an order to the effect following:

"Whereas, H. E. Boyd, trustee, did on the 24th day of January, 1901, present his petition to this court, praying, for reasons therein set forth, that the bankrupt, Morris Glucklich, be required to turn over to him certain money and property now in his control, belonging to his estate: Now, therefore, upon reading the application of H. E. Boyd, trustee, and after a full and complete examination of the bankrupt, being present in person and by counsel during all of said examination, and upon hearing and upon the evidence, I find that the bankrupt has failed to turn over to the trustee money and property in his possession and control as follows, to wit:

| | |
|---|---:|
| Cash on hand as shown by schedule.......................$ | 140 00 |
| Cash in pocket......................................... | 81 75 |
| Cash with wife......................................... | 400 00 |
| Cash claimed with Adolph Levy........................... | 1,200 00 |
| Cash claimed with niece, Regena......................... | 225 00 |
| Deficiency in stock.................................... | 16,000 00 |
| Expenses credited on cash book not paid.................. | 1,000 00 |
| Expenses credited twice paid by check.................... | 571 26 |
| Interest paid on homestead mortgage..................... | 53 00 |
| Cash paid for exempt insurance.......................... | 95 40 |

Total cash on hand........................$19,766 41

"It also appears from said examination that said bankrupt has in his possession, as the property of said estate, and not exempt, 25 dozen cans of canned goods, and policy of insurance in the Equitable Life Insurance Company, as shown by schedule.

"It is therefore ordered that the bankrupt turn over said property and money within five days to said trustee, H. E. Boyd, and that a copy of the order be served forthwith on said bankrupt.

"[Sgd.]           M. J. Hallinan, Referee in Bankruptcy."

Thereupon the bankrupt filed a petition for a review by the district court of the proceedings before the referee, and upon hearing the petition that court made the following order:

"The petition for review of the order of the referee having been fully considered, it is ordered that the order of the referee be, and the same is, modified, and the order is as follows, viz.:

"The bankrupt will turn and pay over to H. E. Boyd, the trustee, within ten days from this date:

1. Cash on hand as shown by schedule.........................$140 00
2. Cash in pocket............................................ 81 75
3. Cash with wife........................................... 200 00
4. Interest paid on homestead mortgage....................... 53 00
5. Cash paid for exempt insurance........................... 95 40

Making a total of..............................$570 15

"And said bankrupt will also turn over to said trustee within ten days from this date said three hundred cans of canned goods, or their fair value. And if he fails to obey any part of this order, he will be committed to the jail of Polk county, Iowa, until he fully complies with this order.

"Done in open court at Des Moines, Iowa, May 23, 1901.

"[Sgd.]                                     Smith McPherson, Judge."

From this order the trustee appealed to this court.

N. T. Guernsey and H. G. Giddings (W. H. Winegar, on the brief), for appellant.

John Shortley (L. V. Harpel, on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

From the record before us it is apparent that the order of the referee was based on the general examination of the bankrupt at the first meeting of his creditors, and while that meeting was still in session. The record discloses that the examination was of that general character contemplated by section 7 of the bankrupt act, which provides that, when present at the first meeting of his creditors, the bankrupt shall "submit to an examination concerning the conducting of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate." No petition had been filed by the trustee claiming that the bankrupt had money or property in his possession or under his control which he should turn over to the trustee. The examination was lengthy and desultory. Immediately upon its close the trustee presented for the first time the list of moneys and property which he claimed the bankrupt should turn over to him, accompanied by a prayer "that the order be entered herein at this time requiring" the bankrupt to turn over the money and property mentioned. This application was filed at 11:30 a. m. At the request of the bankrupt its consideration was postponed until 2:20 p. m. of the same day, when, without any answer being filed by the bankrupt, or an issue otherwise raised, and without any further examination of the bankrupt or hearing any further evidence, the referee entered an order substantially as prayed for by the trustee.

It will be observed that the application of the trustee was not for an order on the bankrupt to show cause, upon reasonable notice, why he should not be required to turn over to the trustee the money and

property mentioned in the application, but was for an immediate and unconditional order to be then made, based on the general and desultory examination of the bankrupt which had just been concluded. We think it apparent from the record that the referee supposed it to be his duty to take up and consider the trustee's motion, in the language of that motion, "at this time," and without giving the bankrupt an opportunity to be further examined, or to introduce evidence touching the particular items of money and property mentioned, and that the bankrupt and his counsel so understood it.

Dispatch in judicial proceedings is commendable, but, in proceedings involving the liberty of a citizen, he has a right not only to be informed of the precise claim against him, but, after receiving that information, he has a right to a reasonable time to prepare his answer and present his proofs, and, lastly, to be heard by counsel on the law and facts of the case. While proceedings in bankruptcy may be summary, they should not be too summary; in other words, they should not be so summary as to deprive the bankrupt of those fundamental rights and privileges that belong to every citizen, among which are the right to be advised of the demand made upon him, and the right, after being so advised, to have a reasonable time to prepare his defense and produce his witnesses. The bankrupt act does not do away with these rights, and no citizen forfeits them by being adjudged a bankrupt. The bankrupt act contemplates that proceedings in bankruptcy shall go forward with all reasonable dispatch compatible with the due and orderly administration of justice and a proper regard for the fundamental rights of the citizen. Construing the proceedings before the referee as we do, we think they were too summary in their character, and that it was against this summary proceeding the bankrupt asked to be heard, and that there was not accorded to him, and not intended to be accorded to him, by the referee, a reasonable time to answer the trustee's application, or to be further examined or to introduce evidence after being advised of the specific claims made against him by the trustee. The referee did not advise him that he had these rights, and the record does not show that he waived them, or intended to do so. As we construe the record, this case is not, in this respect, different from that of In re Rosser, 41 C. C. A. 497, 101 Fed. 562. It is true that in that case the referee made the order based on the bankrupt's general examination in his absence, but it is manifest from the opinion in the case that if the order had been made, as it was in this case, at the conclusion of a long and desultory examination, and the bankrupt heard only in a vain protest against such summary action, the result would have been the same.

The alleged contempt in this case was not committed in the presence of the court, and is therefore what the law denominates a "constructive contempt." It is a criminal offense for which the punishment may be imprisonment without limit of duration, and one charged with it has the same inalienable right to be heard in his defense that he would if charged with murder or any other crime. McClatchy v. Superior Ct. of Sacramento Co., 119 Cal. 413, 51 Pac. 696, 39 L. R. A. 691; State v. Judges Civ. Dist. Ct., 32 La. Ann. 1256; In re Rosser, supra; In re Reese, 47 C. C. A. 87, 107 Fed. 942. In Ex

parte Robinson, 19 Wall. 505, 22 L. Ed. 205,—a proceeding to punish for contempt,—the supreme court said:

"There may be cases, undoubtedly, of such gross and outrageous conduct in open court on the part of the attorney as to justify very summary proceedings for his suspension or removal from office; but even then he should be heard before he is condemned. The principle that there must be citation before hearing, and hearing or opportunity of being heard before judgment, is essential to the security of all private rights. Without its observance, no one would be safe from oppression wherever power may be lodged."

And this was said in a case where the alleged contempt was committed in the presence of the court.

Frequent reference is made to section 41 of the bankrupt act, as though that act invested courts of bankruptcy with broader and larger powers to punish for contempt than is possessed by other United States courts. It does nothing of the kind. This section does not in express terms confer on the court of bankruptcy the power to punish for contempt. But no such enactment was necessary. The moment the court was called into existence it became possessed of this power by the operation of the common law, as well as by section 725 of the Revised Statutes of the United States. The reference to the power to punish for contempt in section 41 of the bankrupt act was not to confer the power on the court of bankruptcy, for its creation alone invested it with that power, but it was to make it plain that the power was not conferred on referees in bankruptcy, and to confer it on the "judge" of the court of bankruptcy, who could not exercise the power in the absence of the statute expressly conferring it. This is done by section 41b, in these terms:

"(b) The referee shall certify the facts to the judge, if any person shall do any of the things forbidden in this section. The judge shall thereupon, in a summary manner, hear the evidence as to the acts complained of, and, if it is such as to warrant him in so doing, punish such person in the same manner and to the same extent as for a contempt committed before the court of bankruptcy. * * *"

By reference to section 41 it will be seen that "the things forbidden in this section," concerning which the referee is required to certify the facts to the judge, include only those things which would be punishable as contempts by all courts of record. They are the common and familiar heads for the exercise of this jurisdiction by all courts of record. No new or enlarged jurisdiction is conferred, and no power to impose a punishment which might not rightly and lawfully be imposed, on a similar state of facts, by any other United States court. Any act, matter, or thing which any United States court may punish as a contempt may be punished as such by a court of bankruptcy; and any act, matter, or thing which cannot be punished as a contempt by other United States courts cannot be punished as such by a court of bankruptcy. Moreover, the mode of proceeding in a court of bankruptcy to determine whether a constructive contempt has been committed should conform to the established practice in like cases in all other United States courts as near as may be, and what is legally sufficient to purge a contempt in the other courts of the United States is sufficient to purge the like contempt in a court of bankruptcy.

A court of bankruptcy cannot sentence a bankrupt to imprisonment for debt, any more than any other court of the United States can do that thing; and what it cannot do directly it cannot do by indirection, under another name. It cannot, therefore, lawfully order a bankrupt to deliver to the trustee money or property he has not got in his possession or under his control, and imprison him if he does not comply with the order. Plainly, that would be imprisonment for debt, and the order is not relieved of that illegal and odious quality by calling it "imprisonment for contempt." The court that makes such an order is in contempt of the law and constitution, and not the bankrupt in contempt of the court.

The seventeenth section of the judiciary act of 1789 (now section 725 of the Revised Statutes of the United States) provides that all the courts of the United States "shall have power to punish by fine or imprisonment at the discretion of said courts all contempts of authority in any cause or hearing before the same." For what was esteemed an excessive and oppressive exercise of the power to punish for contempt under this section and at common law, the United States house of representatives in 1831 adopted and presented to the senate articles of impeachment against Judge Peck, judge of the United States district court for the district of Missouri; and, though the judge was acquitted by the senate, the congress immediately testified its disapproval of his action, and put its repetition out of the power of United States judges in the future, by the passage of the act of March 2, 1831, entitled "An act declaratory of the law concerning contempts of court," now part of section 725 of the Revised Statutes of the United States. This act applies to all courts of the United States which derive their existence and powers from acts of congress, whether created before or after its passage. It defines and limits the powers of the courts of the United States to punish for contempts. Since the passage of this act the power of these courts in the punishment of contempts can only be exercised (1) to insure order and decorum in their presence; (2) to secure faithfulness on the part of their officers in their official transactions; and (3) to enforce obedience to their lawful orders, judgments, and processes. Formerly the only protection the citizen had against the unjust, oppressive, or illegal exercise of this power was found (in the language of Judge Brewer in Re Pryor, 18 Kan. 72, 26 Am. Rep. 747) "in the publicity of all judicial proceedings, and the appeal which may be made to the legislature for proceedings against any judge who proves himself unworthy of the power intrusted to him." The case of Judge Peck is not the only instance in which redress was sought against the unwarranted exercise of this power by the impeachment of the judge. In 1807 articles of impeachment were preferred against the judges of the supreme court of Pennsylvania for an abusive exercise of this power, and, while they were acquitted, their trial led to the passage of the act of the assembly of that state of 1809, limiting and restricting the power of the court to punish for contempt; and impeachment of judges for similar acts and like legislation has taken place in other states. Indeed, in this country the power of the courts to punish for contempt has always been looked on with jealousy, and a very

strong disposition shown to restrict it. It has been declared to be "arbitrary in its nature" (Batchelder v. Moore, 42 Cal. 412); to be an exception to the provisions of the constitution of the United States, and not to be extended in the least degree beyond the limits imposed by statute (Rap. Contempt, § 11; Rutherford v. Holmes, 5 Hun, 317; Bergh's Case, 16 Abb. Prac. [N. S.] 266; People v. Jacobs, 66 N. Y. 8; Ex parte Robinson, 19 Wall. 505, 22 L. Ed. 205). And in a note in 1 Kent, Comm. 330, note "b," it is said "that the power of the courts to punish summarily for contempts has lately been much restricted in England." Not only has the power to punish for contempts been very much restricted, but in many jurisdictions the right of appeal and review of such proceedings has been allowed. And the right of review of the proceedings in the case of an alleged constructive contempt, like the one in the case at bar, is given by the bankrupt act.

The trustee's contention is that the court of bankruptcy erred in not confirming the order of the referee requiring the bankrupt to turn over to the referee the money and property mentioned in that order, and adjudging that the bankrupt be imprisoned until he complied with such order.

Laying aside further consideration of the haste and irregularity with which the referee's order was made, we remark that it is plainly erroneous and illegal in several respects, on its face. It requires the bankrupt to surrender to the trustee, as part of the assets of his estate in bankruptcy, a policy of life insurance, which, as this court has held, is exempt to the bankrupt under the laws of Iowa. Steele v. Buel, 44 C. C. A. 287, 104 Fed. 968. It requires the bankrupt to pay to the trustee the money he had paid out to pay interest on a mortgage on his homestead, and to pay the premiums on his policy of life insurance. These sums appear to have been paid out by the bankrupt for very worthy and commendable purposes, but if they had been paid out for unworthy purposes, or lost at gaming or other immoral practices, the bankrupt could not be committed for not restoring the amounts to his trustee. Touching the last two items, we remark that the court of bankruptcy seems inadvertently to have fallen into the same error; but, as the bankrupt did not appeal from the court's order, the error will not be considered.

The bankrupt had a child afflicted with some disease of the eyes. His wife took the child from Sioux City, Iowa, to St. Louis, Mo., to have its eyes treated by an oculist; and the bankrupt gave her $400 to defray the expenses incident to the trip, and to pay for the professional services of the oculist. This sum the bankrupt is required by the order of the referee to turn over to his trustee. There is no proof in the record before us that the wife did not spend this money for the purpose for which she received it, or that she ever returned any portion of it to the bankrupt, or that any portion of it is within his control. Moreover, it appears that a part of the capital on which the bankrupt originally commenced business was $1,000 of his wife's money.

The bankrupt testifies that he loaned $1,200 to one Adolph Levy. This may have been an improvident loan, and the money may be lost

to the estate of the bankrupt; but, if the loan was made, the court of bankruptcy cannot punish him for making it because it was an improvident act, and cannot commit him to prison until he pays the amount of the loan to his trustee.

The referee's order was not based on what the bankrupt actually had in his possession or control, but on what, in the opinion of the referee, he ought to have had. Apparently the referee assumed it was lawful to imprison for debt under the bankrupt act. The referee required the bankrupt to turn over to the trustee what is termed in the order "deficiency in stock, $16,000." The bankrupt commenced business in April, 1899. This order of the trustee is based on the estimated amount of the bankrupt's stock in trade on July 13, 1900, and his purchases after that date, to which the referee added 25 per cent., the estimated profits of his business, amounting to over $7,000.

In answering these findings of the referee the learned judge of the court of bankruptcy said:

"A man, a brother of the bankrupt, took at pleasure from the store goods in amounts, without entry therefor on the books, and the amounts thereof are not known, all this on the pretense that the brother was a lawyer, and that the bankrupt owed him large sums for legal advice. That large amounts of his goods were disposed of by a senseless desire to compete with others, regardless of the fact that he was thereby selling goods at a clear loss. How much of his estate was thereby squandered, no one knows. The computation made by the referee shows that the bankrupt ought to have so much on hand, but I do not find that he has it on hand. And that is the test. He should not be committed for what he ought to have, but only for failure to turn over what he had when filing his petition. And in declining to order him to turn over a large sum to the trustee, it must not be understood that I commend the course of the bankrupt. His conduct is most reprehensible, and can only be recited to be condemned."

These findings of Judge McPherson appear to be warranted by the facts disclosed by the record before us.

In some of the states there are laws providing for the examination of debtors under oath for the purpose of discovering what, if any, property they have applicable to the payment of their debts. The proceeding is analogous in all respects to the examination of the bankrupt under the bankrupt act. The court is clothed with the power to punish disobedience of its lawful orders in the premises by imprisonment for contempt. The state of Wisconsin has such a law. In a proceeding under that statute (Warren v. Rosenberg, 94 Wis. 523, 69 N. W. 339) it appeared "on the oral examination of the defendant that the firm had in its store during the last year goods of the full value of $35,000, and the defendant, who was the active manager of the business, had been able to account for only about $10,000. The rest had disappeared, and the defendant professed to be unable to further account for it." The lower court found the defendant had within his control $10,000 in money, proceeds of the sale of the goods, and ordered that he pay that sum to the receiver in the case, and, in default of so doing, that he be imprisoned until he complied with the order. On appeal to the supreme court, that court said:

"By that order it is adjudged that the defendant has within his control $10,000 in money, of the proceeds of the goods of the defendant firm, and

he is required to pay over that sum to the receiver immediately. The defendant denied absolutely that he has either property or money of the firm within his power or knowledge. There is no direct evidence that his denial is not true. The court's conclusion seems to rest exclusively upon the inference that, because the defendant firm had a large amount of property some two years ago, the defendant has it now. This is hardly a satisfactory basis for so severe a proceeding. The experience of business men shows that such a conclusion is often a very violent non sequitur from such premises. The logical consequences of such reasoning will often produce the greatest injustice. * * * No man can be imprisoned for mere inability to pay his contract debts, nor for failing to pay over to a receiver money which he does not have. Nor should there be involved in the modern administration of jurisprudence any considerable peril of such consequences."

This case is on all fours with the case at bar, and lays down the only safe rule in such cases. But it is said that the bankrupt's express denial, under oath, that he has the money or property, or any part of it, within his possession or under his control, and that he is absolutely unable to comply with the order of the referee requiring him to turn it over to the trustee, does not stand in the way of the court's sentencing him to imprisonment for contempt until he complies with the order, if the court is satisfied that he has committed perjury in making such denials. It is argued with great vehemence that, if the court may not do this, the bankrupt law fails of its purpose, and becomes a shield and protection to perjured bankrupts. The case of In re Rosser (D. C.) 96 Fed. 305, 308, among others, is cited in support of this contention; but that case was reversed by this court. 41 C. C. A. 497, 101 Fed. 562. The contention is entirely groundless. The bankrupt act makes the amplest provision for punishing in the regular and lawful mode the fraudulent and perjured bankrupt. Section 29b of the act provides that:

"A person shall be punished by imprisonment for a period not to exceed two years upon conviction of the offense of having knowingly and fraudulently (1) concealed while a bankrupt, or after his discharge, from his trustee any of the property belonging to his estate in bankruptcy: or (2) made a false oath or account in, or in relation to, any proceeding in bankruptcy. * * *"

And section 19c provides that:

"The right to submit matters in controversy, or an alleged offense under this act, to a jury shall be determined and enjoyed, except as provided by this act, according to the United States laws now in force, or such as may be hereafter enacted in relation to trials by jury.",

By the provisions of section 14 the bankrupt is required to apply for his discharge within twelve months subsequent to being adjudged a bankrupt, and his discharge is to be denied if "he has (1) committed an offense punishable by imprisonment as herein provided; or (2) with fraudulent intent to conceal his true financial condition and in contemplation of bankruptcy, destroyed, concealed, or failed to keep books of account or records from which his true condition might be ascertained."

It will thus be seen that the act makes the amplest provision for punishing fraudulent conduct and false oaths on the part of the bank-

rupt. The fraudulent bankrupt gains nothing by being adjudged a bankrupt, but is punished criminally and denied a discharge. And his creditors lose none of their rights, for they may resort to all the remedies known to the law for the collection of their debts against the bankrupt, the same as though he had never been adjudged a bankrupt. There is therefore no occasion for the exercise by the court of bankruptcy of any doubtful power or jurisdiction, either for the purpose of punishing the bankrupt or protecting his creditors. If the court has reason to believe that the bankrupt has fraudulently concealed any property belonging to his estate in bankruptcy, or made a false oath in the proceedings in bankruptcy, it should require him to enter into recognizance to answer to any indictment the grand jury may present against him for these offenses.

It is extremely plain the act contemplates that a fraudulent concealment of assets and false oaths by the bankrupt are to be punished as crimes in the mode provided by the act, which secures to the accused the right of trial by jury, and not as contempts of court. The failure of the bankrupt to pay through inability lacks the essential element of contempt. Inability to comply with the command of the court is always a complete defense to a charge of contempt. It cannot be imputed to any one that he is guilty of a contempt of court for neglecting or refusing to do what it appears is out of his power to do. An order of commitment in such case is void. Rap. Contempt, § 115, and cases cited. The ability of a bankrupt to comply with the order of the court must be made to appear, before he can be punished for contempt. And it must be made to appear by evidence which leaves no reasonable doubt in the mind of the court on that subject. Evidence which is merely persuasive will not suffice. He cannot be imprisoned for the purpose of exploitation. Torture as a means of extracting evidence or forcing a confession is no longer allowable either in civil or criminal proceedings. When imprisonment for debt was lawful, a creditor frequently imprisoned his debtor in the hope and expectation that his friends or relations would pay the money required to release him from an imprisonment which otherwise would apparently end only with his life. But no such practice is permissible under the bankrupt act. In the printed record before us, which is all we have to consider, there is no direct evidence to show that the bankrupt has the money, save two or three small items mentioned in the referee's order. The referee's conclusion seems to have been reached mainly, if not altogether, by "approximate" estimates, inferences, and conjectures, which, while they give rise to very strong suspicion, fall far short of direct and conclusive proofs. The sea of suspicion has no shore, and the court that embarks upon it is without rudder or compass. No man can be imprisoned for a constructive contempt on suspicion or conjectures, or upon inferences which may or may not be well founded. For this reason from the earliest times the doctrine has obtained that when one accused of a constructive contempt in a court of law denies positively and specifically the alleged contempt, under oath, the proceeding against him for contempt must be dismissed. In Rex v. Sims, 12 Mod. 511,—one of the earliest cases to be found in the books on the subject,—this is the opinion:

"Per Curiam. If one brought in, in contempt, deny all upon oath, he is, of course, discharged of the contempt; but, if he has forsworn himself, he may be prosecuted for perjury."

Mr. Blackstone says:

"If the party can clear himself upon oath, he is discharged, but, if perjured, may be prosecuted for the perjury." 4 Bl. Comm. 288.

The doctrine thus laid down is still the rule followed by courts of common law; those courts uniformly holding that, if one accused of a constructive contempt fully answers all the charges on his oath, he must be discharged; the answer must, for the purposes of the contempt proceedings, be taken as true, and extrinsic evidence cannot be received to impeach it. And this is the doctrine in the federal courts. In the case of U. S. v. Dodge, 2 Gall. 313, Fed. Cas. No. 14,975, the court (Mr. Justice Story and District Judge Davis) said:

"We cannot receive any collateral evidence as to the offense, but if the respondent, by his affidavit and answer on oath to interrogatories proposed by the district attorney, discharges himself of the contempt, no other proceedings can be had against him on the attachment. If from any collateral evidence it should appear that there is reason to believe the respondent has perjured himself, we will recognize him to answer at the next term of court to such matters as may be found against him."

This case is cited approvingly by that eminent jurist, Judge Curtis, in Re Pitman, 1 Curt. 186, Fed. Cas. No. 11,184.

In Burke v. State, 47 Ind. 528, the court, after a somewhat extended review of the authorities, say:

"It is settled by the entire current and whole weight of authority that in cases of criminal constructive contempt the party should be discharged when he has purged himself of the contempt under oath, and the opinion in the above case [a case previously decided by that court] should be in that respect modified. This modification was prepared by, and meets the approval of, the writer of the opinion in the above case, who has become satisfied from an examination of the authorities that he was led into error by supposing that the rule in chancery was applicable to cases of criminal contempt."

And see, to the same effect, Buck v. Buck, 60 Ill. 105; State v. Earl, 41 Ind. 464; Haskett v. State, 51 Ind. 176; Rap. Contempt, § 119.

In the view we take of this case, it is not necessary for the court now to decide whether the doctrine of the cases we have cited is applicable to proceedings for contempt against a bankrupt for failing to comply with an order to pay to the trustee money supposed to be in his possession or within his control, for the reason, as we have pointed out, that the question as to whether the bankrupt had in his possession or under his control the items of money mentioned in the referee's order was not raised in a manner and at a time that gave to the bankrupt an opportunity of responding under oath to these specific claims. Most, if not all, of the testimony upon which the referee based his order was taken at a time when the bankrupt did not understand that it was elicited for the purpose of making an order upon him to turn over moneys alleged to be in his possession.

Upon the whole, we think the ends of justice will probably be promoted by reversing both the order of the bankrupt court and of the referee, and remanding the case to the court of bankruptcy, with directions to permit the trustee, if he shall be so advised, to file a petition

particularly specifying the sum or sums of money and property which he claims the bankrupt wrongfully withholds from him, and that reasonable notice be given to the bankrupt of the hearing on the petition, and that the bankrupt be permitted to answer the same under oath, and to submit to a further examination under oath if the court shall so direct, and that both parties have leave to introduce such further testimony as they may be advised.

SANBORN, Circuit Judge. I concur in the order reversing the orders below because the evidence in the record satisfies my mind, beyond a reasonable doubt, that the bankrupt had in his possession or under his control at the time the order of the referee was made a much larger amount of property that belonged to his estate in bankruptcy than the amount which the court finally ordered him to surrender to the trustee. The rule by which this issue is to be determined is that the property of the bankrupt estate traced to the recent possession or control of the bankrupt is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance. He cannot escape an order for its surrender by simply adding perjury to fraudulent concealment or misappropriation. It is still the duty of the referee and of the court, notwithstanding his oath and his testimony, if satisfied beyond a reasonable doubt that he has property of the estate in his possession or under his control, to order him to surrender it to the trustee, and to enforce that order by confinement as for contempt. These rules are established and illustrated by the following cases: In re Salkey, 21 Fed. Cas. 235, 238–240, Nos. 12,253 and 12,254; In re Schlesinger, 42 C. C. A. 207, 208, 102 Fed. 117; Id. (D. C.) 97 Fed. 930, 932; In re Deuell (D. C.) 100 Fed. 633, 634; In re Greenberg (D. C.) 106 Fed. 496; In re McCormick (D. C.) 97 Fed. 566, 567; In re Mayer (D. C.) 98 Fed. 839, 841.

The foregoing authorities and those cited below also sustain the proposition that the rule that one charged with constructive contempt may conclusively purge himself thereof by his own oath, which may prevail in cases at law in Indiana and in some other jurisdictions, has no application to cases involving a disobedience of an order of a court to pay money or surrender property, or to cases involving the disobedience of an order of a court of bankruptcy or of equity, or, in many of the code states, to cases involving the disobedience of an order of a state court. In all proceedings for contempt for the disobedience of orders in bankruptcy and in chancery, and in most of the code states in all cases of proceedings for contempt for disobedience of an order of a court, the sworn answers of the party charged with the contempt are evidence to purge him thereof, but they are not conclusive evidence. They may be contradicted and supported by other testimony, and the question whether or not the party charged has purged himself of the contempt is always to be decided upon a careful consideration of all the evidence produced for and against him. Moreover, an attachment for the disobedience of an order to pay money or to surrender property is considered rather as a civil execution for the benefit of the equitable owners of the fund or property than as a criminal proceeding, although it is in the form of a criminal process for

a contempt of the authority of the court. Buck v. Buck, 60 Ill. 105, 106; Smith v. Smith, 14 Abb. Prac. 130, 132; 4 Bl. Comm. p. 288; Crook v. People, 16 Ill. 534, 537; In re Pitman, 19 Fed. Cas. pp. 727–729, No. 11,184; Rap. Contempt, § 120; Underwood's Case, 2 Humph. 46, 49; Rutherford v. Metcalf, 5 Hayw. 58, 60, 61; Magennis v. Parkhurst, 4 N. J. Eq. 433, 434; State v. Harper's Ferry Bridge Co., 16 W. Va. 864, 873; State v. Matthews, 37 N. H. 450, 455, 456; Henry v. Ellis, 49 Iowa, 205, 206; Crow v. State, 24 Tex. 12, 14.