---

## In re KANE.

(District Court, M. D. Pennsylvania. September 15, 1903.)

**1. BANKRUPT—FAILURE TO TURN OVER ASSETS TO TRUSTEE—CONTEMPT—VOIDABLE PRIORITY.**

A bankrupt cannot be adjudged in contempt for failure to turn over to his trustee, pursuant to order of the referee, money which, before the proceedings were begun, had been paid out by him to creditors.

**2. SAME.**

The sole purpose of a contempt proceeding against a bankrupt for failure to turn over assets to his trustee is to reach and compel the surrender of all property in his actual control or possession, and not to punish him for concealing assets from his trustee.

**3. SAME—SUFFICIENCY OF EVIDENCE.**

In proceedings against a bankrupt for contempt for failure to turn over to his trustee, on order of the referee, money traced into his hands, it is not a sufficient accounting by him for such money to say that he gave it to his wife, who has spent it for the benefit of himself and family.

On Exceptions to Report of Referee.

H. F. Maynard and C. C. Yocum, for bankrupt.

E. G. Herendeen and Joseph W. Beaman, for defendant.

ARCHBALD, District Judge. The referee found that the bankrupt had in his hands $1,340, and ordered him to turn it over to his trustee; and, for the failure to do so, he has reported him in contempt. Whether he is, or not, depends on the correctness of this finding. The checks which the bankrupt received from Farley upon the sale of his merchandise and accounts, amounting to $2,538.58, he turned over to his attorney, Yocum, who had them cashed at once at the Sayre National Bank, and paid out of the proceeds two overdue notes, of $1,160, which were lying there. We are not concerned at this time with the validity of the sale, nor the circumstances attending it, nor whether the payment to the bank was a voidable preference. The bankrupt certainly has not got the $1,160 so turned over to it, and he cannot, therefore, be charged therewith. The only question is as to the remainder. This was left with the bank, but was not put to the credit of the bankrupt, probably to escape checks which were outstanding. This occurrence was on May 19, 1902, and on May 23d a petition in involuntary bankruptcy was filed against Kane, on which an adjudication was had July 24th following. It would have been obtained earlier, except that the bankrupt had withdrawn from the district, and his whereabouts were not known. Somewhere about June 19th Yocum drew from the bank the money which had been left

there, and took it to Milville, N. J., where Kane, as it seems, had been staying with his wife's relatives, and gave it into Kane's hands. Out of what was so received, Kane paid Yocum a bill for services of $50, and gave him $750 additional with which to settle a claim which his brother Patrick J. Kane had against him. This was a debt incurred a year or two previous, when Michael bought out his brother Patrick's half interest in the business which they had been carrying on together. Yocum succeeded in securing a settlement for $600, and turned over the $150 which he saved to the bankrupt's wife. It is contended that the money so turned over to Patrick was to be held by him for the benefit of the bankrupt, but there is not a shadow of anything to sustain such an idea. It is true that Patrick says the money was paid to him the evening of the sale, and that he spent it all soon afterwards on a wedding trip; also that he gave a receipt for it the same day; and the receipt which is produced bears date of May 19th, in apparent accordance. But his story is very unsatisfactory in many ways, which I will not stop to discuss; and, contradicted as it is by both Yocum and the bankrupt, I do not believe it. The date of the receipt is to be explained either as a mistake of May for June, as Yocum suggests, or a dating back for some undisclosed purpose. Assuming, as testified, that the money turned over to him was $1,340—although the amount left with the bank was somewhat more than this—and taking out that which the bankrupt paid to his attorney and to his brother, there was left in his hands, including that returned to his wife, the sum of $690. The only thing he has to say of this is that he gave it to his wife, and that it has been spent for the benefit of himself and family. This, however, is not a sufficient accounting for it, nor does it seem at all probable. He stayed at Milville, according to his story, about six weeks, and then got work at Philadelphia as a motorman, and went there to live, by which time his earnings, as we have the right to assume, would largely support those dependent on him. He was only called to draw upon this money, therefore, for a brief period; and he was likely, from his reduced circumstances, to be somewhat saving of it. It is hardly to be believed that by the middle of October, when he was examined before the referee, he had made away with the whole of it, as he testifies. Money having been traced directly into his hands, he cannot swear himself free from liability by any such general and sweeping statement. The limits of a proceeding of this character are, no doubt, to be recognized and observed. It is not intended to punish the bankrupt for concealing assets from his trustee, for which the law otherwise provides, nor for frauds or delinquencies of which he may appear to be guilty. The sole purpose is to reach, and compel the surrender to the trustee of, property belonging to the estate in the actual control or possession of the bankrupt (Boyd v. Glucklick, 8 Am. Bankr. R. 393, 116 Fed. 131, 53 C. C. A. 451; In re Gerstel, 10 Am. Bankr. R. 411, 123 Fed. 166; Brandenburg, Bankruptcy, § 54), although for this the power of the court is plenary (Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, 7 Am. Bankr. R. 224). Having regard to what is involved, it is to be exercised with caution; but, where a proper case is presented by the evidence, the court is not to allow itself to be

deceived by evasions, nor deterred by the consequences. In the present instance, while I cannot sustain the finding of the referee that the bankrupt had in his hands, at the time the order to turn over was made, the $1,340 which was so required of him, I feel compelled to find that he did have the greater part of the $690 left after deducting the payments to his brother Patrick and to his attorney. Exactly how much, to a dollar, this was, we may not be able to say; and the bankrupt, after having had opportunity, both before the referee and the court, except the bare statement that he had spent it, throws no light upon the matter. The only thing left is to estimate it; and, allowing for the time before he got work in Philadelphia, and taking into consideration that he took some money away with him (although not much), it is fair to say that he must have had at least $600 at the time of the hearing last October. This, I am constrained to hold, he must now turn over to his trustee.

Let an order be drawn requiring the bankrupt to pay to his trustee the sum of $600, moneys of the estate in his hands, within 20 days from the service of this order upon him, or, in default thereof, that he be adjudged in contempt.