In re LASKY.

(District Court, N. D. Alabama, W. D. July 11, 1908.)

BANKRUPTCY—REFUSAL OF BANKRUPT TO SURRENDER PROPERTY—COMMITMENT FOR CONTEMPT.

The property of a bankrupt estate traced to the recent control or possession of the bankrupt is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance, and where the court on ample evidence has found that it still remains in his possession or under his control, and that his testimony as to its disposition is incredible and untrue, and has ordered him to turn it over to his trustee, his mere denial under oath is not sufficient to purge him of contempt for refusal to obey such order.

In Bankruptcy. On motion to commit Joseph Lasky, a bankrupt, to jail for contempt of court in failing to pay into court the sum of $1,800, previously decided by the court to have been withheld by him from his trustee.

Henry Fitts and Jere Murphy, for the motion.
C. B. Powell, opposed.

HUNDLEY, District Judge. On a former date, and upon a petition filed in this cause by the bankrupt, Joseph Lasky, asking this court to review an order of the referee in bankruptcy requiring said bankrupt to pay into court the sum of $1,800, and after a full hearing upon that petition and the consideration of evidence produced both on behalf of the bankrupt and on behalf of the trustee, I confirmed the order of the referee, and held that, under the evidence produced, the bankrupt had within his possession the sum of $1,800, which he was fraudulently withholding from and refusing to pay to his trustee in bankruptcy. This court, in a decree rendered at the

time, gave the bankrupt seven days in which to pay the money into court, and, this time having now expired, motion is made here to commit the bankrupt for contempt of court in failing to comply with that order of the court. The motion now pending is resisted by the bankrupt chiefly as matter of law, and no additional evidence is sought to be produced, except the bare affidavit of the bankrupt himself that he has no funds in his possession from which to pay the sum of $1,800 adjudged to be in his possession.

Before considering the law bearing upon the question at issue, it is proper that I should rehearse, in this connection, the facts upon which I found that Lasky was holding in his possession the sum of $1,800. Lasky was engaged in the mercantile business in the city of Tuscaloosa, Ala., with a partner by the name of Goldberg. The business was conducted under the name of Lasky & Goldberg. This firm succeeded in doing away with more than $6,500 worth of goods bought in February and delivered early in March. These goods, or money procured from their sale, disappeared from the reach of creditors in a very short period of time, estimated at sixty days. In addition to this, the testimony shows that in January there was a very considerable stock of goods in the storehouse—approximately $2,500 worth. Therefore between January and May, five months, $9,-000 worth of money and goods were withdrawn from the grasp of creditors, and two-thirds of this amount was spirited away in less than two months. Of all the goods purchased in the first five months of the calendar year 1908, not one dollar's worth is paid for.

Upon his examination the bankrupt, Lasky, attempted to account for this surprising condition of things by saying that he lost some $2,000 of the money in gambling, and that these losses were sustained upon some 14 to 17 trips to Birmingham, one trip to Montgomery, and in night games at the McLester Hotel in Tuscaloosa. Upon his first examination he said that he could not tell the name of a single person with whom he played or a single person who ever saw him playing in Birmingham, Montgomery, or Tuscaloosa. He said upon that examination that all of his Birmingham games, except one played at the Gayety Hotel about the time of his adjudication, had been played either at the Florence or at the Birmingham Hotels. He said, also, that of the numerous trips he made to Birmingham—14 in all—on 12 of these trips he put up either at the Metropolitan or the Gayety Hotels, and that he registered some 3 or 4 times under an assumed name and upon all other occasions in his own name. He could not remember by whom he was invited into the games at the various hotels, and he could not remember the number of any of the hotel rooms in which he had played the various games. Under Lasky's testimony, all of these losses must have been sustained between March 1st and May 5th, 66 days. It appears from his own testimony that he was in Tuscaloosa a very considerable portion of the time attending to his business. About one-half of this time he was running the store alone, as his partner had decamped. The testimony of his young lady clerk shows that he was in Tuscaloosa four out of the nine weeks, with the exception of three days, during which time he was said to have been sick. He was there regularly, because he opened the store every

morning and was there awaiting her when she arrived for the day's work. With the four weeks accounted for by this clerk out of the reckoning, his testimony claims 17 trips to Birmingham, 1 trip to Montgomery, and numerous night games at the McLester Hotel in Tuscaloosa, that is to say, that out of the 35 days in which he was out of town he was engaged in gambling 18 days, and that during the 17 days he was at home he was doing heavy night gambling, and losing uniformly. This is remarkable, to say the least. But his claim is that numbers of the Birmingham trips lasted at least two days, so that, if his story is true, he was out of town substantially all of the time accounted for by his clerk, leaving him no opportunity to have attended to his business after Goldberg left, as he testified he did quite closely for some six months, and he is unable to remember the name of one single individual with whom he played at any time or to whom he lost so much money. To believe this story would tax my credulity beyond endurance. But Lasky is further discredited when the Metropolitan Hotel register is produced, covering the entire period from March 1st to May 5th, and it shows no registration of Joseph Lasky at all, and when the register is laid before him, and he is called upon to identify the registration under assumed names, he points out a few names entered on the register prior to March 26th, which he claims to believe were his registrations, but would not identify them positively as such. Further than this, the testimony shows that, upon the examination of Lasky as to his knowledge of the game of poker at which he claims to have lost his money, he seemed to have no real acquaintance with the game, but only knew the simpler hands which any tyro might know, and he fails to meet a test of knowledge which any player of his claimed experience ought certainly to be able to meet.

Such is the condition of the testimony upon which the referee made the order. After this order was made, Lasky appears to have employed new counsel and made application to have the order set aside, and upon the hearing had upon this application he weaves the web of deceit and improbability more firmly about him. First, the registration at the Gayety Hotel from March 17th to May 5th is brought into court, and further discredits his repeated registration at that hotel in his own name as well as assumed names; the showing by that register being that he never registered there between those dates in his own name, and that, if he registered there at all under an assumed name, it was only upon one occasion prior to May 5th. By a man named Gordon he appears to have proven a game and a state of intoxication at the Gayety Hotel; but this witness (Gordon) demonstrates the utter incredibility of the whole story when he says that Lasky's repeated trips to Birmingham averaged two days in length, and that he spent many nights in a character of dissipation different from card playing, and so worked out for Lasky a schedule of dissipation which was absolutely impossible of achievement within the time limit of Lasky's return from New York, in March, and his bankruptcy, in May, unless Lasky possessed, like Joshua of old, the power to arrest the passage of time to enable him to work out his peculiar program. Strange, indeed, that in his previous examinations, when

called upon for the name of some person to corroborate his story, Lasky could not once recall his familiar friend, Gordon. More than that, confronted with the necessity of corroboration, he finds that he has forgotten another witness to his dissipation, a Tuscaloosa townsman, one Ben Graubard, who tells a very vivid story of having seen Lasky in a game on the parlor floor of the McLester Hotel in the room of his old-time New York friend, one Joe Greenfield, on a Sunday night about the middle of April, losing heavily; but this new found corroboration, it seems, does not bear the test of the hotel register; it showing that Joe Greenfield was never at the hotel during the month of April, and that different and other people registered in that room on each Sunday night in April, and it further appears that no person by the name of Greenfield during the whole month of April registered at the only other hotel in Tuscaloosa. Indeed, so improbable is the story of Joe Greenfield, and so thoroughly does the inconsistency of the testimony of Gordon expose the whole scheme, and so much does the appearance of the Gayety Hotel register in the record discredit Lasky, that this court was amply justified in concluding that the additional examination held under the motion to nullify the order further discredits Lasky's explanation. From all the evidence presented before me, I found that Lasky was withholding at least $1,800 of funds which should be turned over to his trustee, and upon a further consideration of the testimony I am still of the same opinion now. I cannot believe his improbable story and cannot permit him to use the bankrupt law to further his ignoble ends.

It is argued with great earnestness, by counsel for Lasky, that an order of commitment for contempt is improper, in the face of Lasky's oath that he has not the money, regardless of the finding of this court that he has this money. In other words, it is claimed that it is open to this bankrupt, as well as any other bankrupt, to avoid an order of this sort by deliberate perjury, and that such perjury dissolves all pecuniary responsibility and relegates the creditors to a prosecution for perjury. It is true that this contention does find some support in the opinion of Judge Caldwell in Boyd v. Glucklich, 116 Fed. 138, 53 C. C. A. 451, although I do not believe that he there intended what he said in respect of the "purging by oath" as an authoritative construction of the bankruptcy law. My reason for this conclusion is because the order made reversing the case and directing the taking of further testimony is wholly inconsistent with the proposition that the bankrupt's oath makes an end of the proceedings; but, however that may be, Judge Sanborn, in the same case, takes issue on the "purging by oath" proposition, and in a most forceful manner arrays the many opposing authorities in convincing number. He says, in part:

"The rule by which this issue is to be determined is that the property of the bankrupt's estate, traced to the recent possession or control of the bankrupt, is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance. He cannot escape an order for its surrender by simply adding perjury to fraudulent concealment or misappropriation. It is still the duty of the referee and the court, notwithstanding his oath and his testimony, if satisfied beyond a reasonable doubt that he has property of the estate in his possession or under his control, to order him to surrender it to the trustee and to enforce that order by confinement as for contempt."

The Caldwell opinion has been expressly repudiated, and the Sanborn opinion has been expressly adopted in the Eighth circuit, wherein Boyd v. Glucklich was decided, in Schweer v. Brown (C. C. A. 8th Circuit) 130 Fed. 328, 64 C. C. A. 574, wherein Hook, Circuit Judge, speaking for the court, after citing a number of authorities, says:

"These cases also furnish a conclusive answer to the claim of the bankrupt that his mere denial under oath of the possession of assets is conclusive, and that in such cases the only remedy of the trustee and the creditors is by proceedings under the penal sections of the bankrupt act."

The Sanborn opinion is in line with the decisions previously rendered and has been generally followed in the federal courts. In the case In re Gerstel (D. C.) 123 Fed. 166, a case wherein efforts to account for dissipation of funds by extravagant living are discredited and an order to pay in $1,500 is passed, Humphrey, Judge, says:

"Counsel for the respondent contend that the answer to the rule being under oath is conclusive upon the court. I cannot accept that view. The question seems to be settled in this circuit, having arisen in the Salkey Case, Fed. Cas. No. 12,253, 6 Biss. 269, before Judge Blodgett, under the bankruptcy act of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517), and his decision confirmed on application for review by Drummond, Circuit Judge. The same rule is followed in the Ninth circuit in Ripon Knitting Works v. Schreiber (D. C.) 101 Fed. 810 (Hanford, District Judge), and approved by the Circuit Court of Appeals. 104 Fed. 1006, 43 C. C. A. 682. The rule in these cases is that the answer of the respondent is not conclusive on the court, that the court may proceed to inquire into the facts, and, where it has been shown that the property has come into the hands of the bankrupt shortly before the adjudication, that the schedules give no account either of this property or its proceeds, and that the bankrupt by an answer or by examination under oath fails to make any credible explanation, showing what became of such property, the court when so satisfied is authorized to consider the property or its proceeds as being still in the possession or under the control of the bankrupt, and to require by order that it be produced and delivered to the trustee, and upon failure to obey such order to punish by imprisonment for contempt. A consideration of all the cases upon the subject leads me to the conclusion that this is the law of the case. Many other cases could be cited. I have fully considered the case of Boyd v. Glucklich, 116 Fed. 131, 53 C. C. A. 451, together with all other cases cited by counsel for the bankrupt; but my mind adheres too strongly to the rule above announced."

Platt, Judge of the Second circuit, repudiates the "purging by oath" doctrine, and in Re Leinweber (D. C.) 128 Fed. 641, a case where the bankrupt claimed to have paid the money out to creditors, but could not produce them or evidence of such payment, says:

"I am fortified in respect of my action by the position which Judge Brown took in Re Schlesinger (D. C.) 97 Fed. 930, which was confirmed by the Court of Appeals for this circuit. 102 Fed. 117, 42 C. C. A. 207. The bankrupt relies upon Boyd v. Glucklich, 116 Fed. 131, 53 C. C. A. 451. I am not persuaded by the reasoning of the majority of the court in that case. Judge Sanborn in his opinion, while for obvious reasons concurring in the result, sets forth succinctly the principles which evidently controlled the court in the Schlesinger Case and cites several federal authorities in support thereof."

In re Kane (D. C.) 125 Fed. 984, is a case where the bankrupt swore positively that he had not the money, and Archbald, Judge (evidently having Boyd v. Glucklich in mind, for he cites it among other cases), says (where statement of bankrupt that he had given the mon-

ey to his wife and she had spent it held not to be sufficiently accounted for its disposition):

> "It is not intended to punish the bankrupt for concealing assets from his trustee, for which the law otherwise provides, nor for frauds or delinquencies of which he may appear to be guilty. The sole purpose is to reach and compel the surrender to the trustee of property belonging to the estate in the actual control or possession of the bankrupt. Having regard to what is involved, it is to be exercised with caution; but, where a proper case is presented by the evidence, the court is not to allow itself to be deceived by evasions nor deterred by the consequences."

In Moody v. Cole (D, C.) 148 Fed. 295, the judge affirmed the finding of the referee by which the bankrupt, Mrs. Cole, was required to pay money into court, although in that case the following contention was made, which I quote from the opinion:

> "It is claimed by her counsel, in his very able presentation of this cause to this court, that this denial of the bankrupt should be practically conclusive in the matter, and that in the face of such denial the court should not adjudge her to be in contempt."

The courts of bankruptcy have also held that the answer to the rule to show cause is not conclusive, but transversable, that weight should be given to the denial of the bankrupt, but that it is the duty of the court to examine all the evidence, both circumstantial and direct, relating to the matter to see whether there are any inconsistencies in the bankrupt's testimony or conduct which affected his testimony. In our own Fifth circuit, the "purging by oath" doctrine is, I think, plainly discredited by a decision of the majority of the court in Re Purvine, 96 Fed. 192, 37 C. C. A. 446. In the later case of Samel v. Dodd, 142 Fed. 68, 73 C. C. A. 254, an opinion of Judge Shelby yields assent to the trend and current of authority and recognizes (middle of page 73 of 142 Fed., middle of page 259 of 73 C. C. A.) that the order should be made where it does "appear clearly and affirmatively from the record, notwithstanding his denials, that he has power to comply with the decree." The following from the earlier cases decided under the present bankruptcy act fully support the contentions of the movant here: In re Schlesinger (D. C.) 97 Fed. 930: Big purchases, quick sales and spiriting away of money. Professed ignorance and forgetfulness of recent business. In re Deuell, 100 Fed. 633: Goods and money spirited away. What she could have reasonably expected is calculated and order given for residue. In re Greenberg (D. C.) 106 Fed. 496: Incredible story of having lost pocketbook. The former action of this court in discrediting the bankrupt's uncorroborated story of gambling losses is directly in line with In re Henderson (D. C.) 130 Fed. 385. See latter part of opinion in Schweer v. Brown, 130 Fed. 328–330, 64 C. C. A. 574.

From the above-cited cases it seems clear to my mind that the following principle of law is well settled, to wit: That the property of a bankrupt estate, traced to the recent control or possession of the bankrupt, is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance. Now let us see what may be properly deduced from the evidence as showing the property to be in the bankrupt's possession during the five months next before his adjudication:

A stock of goods on hand worth at least.........................$2,500 00
Goods purchased within the five months for which not a dollar was
  paid ...................................................... 6,500 00

                                                         $9,000 00

How and for how much of this does he account? First: He says that all goods were sold and converted into cash. The evidence indicates that they brought about cost, but let us allow $2,000 for his selling cheap and the little remnant left in the store, so we have:

| | | |
|---|---|---|
| Item 1. | Discount to get quick sales............................ | $2,000 00 |
| Item 2. | (He gives in detail his cost of doing business, and under that evidence $100 a month is a liberal allowance, so) expenses of running store were...................... | 500 00 |
| Item 3. | (His checks show exactly what he paid on old accounts, freight, and drayage in these five months.) Paid for goods, freight, and drayage about...................... | 1,300 00 |
| Item 4. | Goldberg's living expenses, $200 per month............... | 1,000 00 |
| Item 5. | Lasky's living expenses, $200 per month................. | 1,000 00 |
| Item 6. | Accident to sister...................................... | 500 00 |
| Item 7. | Mother's and sister's trips............................. | 300 00 |
| Item 8. | Money which Mr. and Mrs. Goldberg took away for living expenses, about.................................... | 300 00 |
| | Total....................................... | $6,900 00 |

This resolves every doubt in the bankrupt's favor and is more liberal to him than are the reported cases. It shows $2,100 coming into his possession and wholly unaccounted for, and the estimate made by the court is certainly not overdrawn and, if anything, is rather below what may be sustained by the evidence. It is not attempted to state the exact amount of the bankrupt's frauds and concealments. The law does not require this, for, as is said in Re Schlesinger (D. C.) 97 Fed. 930:

"A debtor is not, however, to go scot-free because the exact amount of his frauds and concealments are not ascertainable, nor should the bankrupt act be suffered to be paralyzed as respects the creditors by such means."

A merchant should not be permitted to shut his eyes to the disappearance of his goods, and when called upon by the court to account therefor escape the penalty of the law by simply saying: "I have not the goods. I have no money." In a proceeding of this character, it is not within the province of the court to inflict punishment for dishonest conduct; but, in a careful effort to avoid such result, a court, when called upon to pass upon the weight of testimony and the credibility of witnesses, is not to be deprived of those faculties of judgment and discrimination as to what is true and probable, on the one hand, and untrue and improbable or absurd, upon the other, which are permitted to be exercised by juries in similar cases.

I am clearly of the opinion, from all the evidence in this cause, that Lasky has in his possession or under his control the sum of at least $1,800, which he has failed to pay over to his trustee under a former order of this court.

For his refusal to comply with this order, he is in contempt of this court, and an order will now be entered committing him to jail until the further orders of this court.