## In re ALPHIN & LAKE COTTON CO.

(District Court, E. D. Arkansas, W. D.   January 23, 1905.)

1. BANKRUPTCY—PROPERTY BELONGING TO BANKRUPT—RECOVERY BY TRUSTEE—NATURE OF PROCEEDING.

A proceeding by a bankrupt's trustee to recover assets alleged to belong to the bankrupt from a third person is not criminal in its nature because the person proceeded against may be punished for contempt in case he fails to comply with the court's order, and hence the trustee is only bound to establish defendant's possession of assets belonging to the bankrupt by evidence plain and convincing beyond reasonable controversy.

2. SAME—BURDEN OF PROOF.

Where, in a suit by a bankrupt's trustee to recover assets alleged to belong to the bankrupt, the fund is traced into the hands of the defendant, the burden is on him to make some reasonable explanation of its disposition in order to avoid a decree for the surrender thereof.

3. SAME—EVIDENCE.

In a proceeding by the trustee of a bankrupt corporation, organized by defendant for the furtherance of fraudulent cotton transactions, to charge the latter with funds received by him and alleged to belong to the corporation, evidence *held* to require a finding in favor of the trustee.

In Bankruptcy.
See 131 Fed. 824.

John M. Moore and W. B. Smith, for trustee.
Campbell & Stevenson, Smead & Powell, and W. D. Chew, for E. H. Lake.

TRIEBER, District Judge.   In January, 1903, the above-named corporation, which, for convenience, will be referred to as the "Cotton Company," was adjudicated a bankrupt in this court.   After the examination of E. H. Lake, who was the practical owner and in absolute control of the entire management of the cotton company, the trustee in bankruptcy of the cotton company filed a petition, duly verified, charging that the said Lake and Alphin, another of the officers of the corporation, had large sums of money and other property of the assets of the bankrupt corporation, amounting to over $250,000, in their possession or under their control, and asking that they be required to turn it over to the trustee.   After due notice, testimony was taken before the referee in bankruptcy, to whom the cause had been referred, and he made findings that J. S. Alphin had no moneys or property in his possession or under his control, but that E. H. Lake, the respondent herein, had large sums of money, amounting to over $100,000, in his possession or

under his control, belonging to the bankrupt corporation, which he should be required to pay over. No exceptions were taken to the findings made by the referee in favor of Alphin, but a petition for review by this court was filed on behalf of Lake. At the hearing on the petition for review before the court objections to the admission of the testimony of one Smith, which had been made before the referee, but by him overruled, were sustained by the court, and leave was granted to the trustee to retake the testimony thus excluded (a report of which will be found in 131 Fed. 824), which was done, and by consent of parties the entire cause, instead of being rereferred to the referee, was brought before the court for final determination. The testimony is very voluminous, and shows a remarkable state of affairs. It seems that the cotton company was organized as a corporation the first part of September, 1902, although it commenced doing business on the 26th day of August, 1902, succeeding the same business theretofore carried on by E. H. Lake. The failure of the cotton company, which resulted in the bankruptcy proceedings, took place in January, 1903. The liabilities, without counting some small debts, amount to $381,636.93, the nominal assets to $23,910.66, and the real assets to less than $500. The corporation existed less than five months, and during that time handled nearly $2,000,000 in money. No books were kept, except memoranda, drafts drawn on them, and stubs of the checkbooks; and these were incomplete, as large sums of money were drawn on checks not in the regular checkbook and by drafts on the Bank of El Dorado, Ark., of which no account was kept by the cotton company. In order to ascertain the transactions of the corporation it was necessary to have expert accountants construct a set of books from these memoranda, and the accounts of the corporation as they appear on the books of the different banks with which it did business during that time, and the copies of bills of lading issued by the railroad company for shipments of cotton. The trustee and Lake each employed a different accountant for the purpose of constructing a new set of books, and, as is usual in all cases when there are two or more accountants employed on different sides of the case, each reached a different conclusion. As each of the accountants was examined, and thus given an opportunity to explain how he reached his conclusions, the court has been able, after a thorough examination of their accounts and their testimony and the testimony of other witnesses, to reach a conclusion which, if not absolutely correct, will do substantial justice, and in no event do any injustice to the respondent, as all doubts have been resolved in his favor.

The liabilities of the cotton company about which there is no dispute are $381,636.93. How this large indebtedness could have been incurred within so short a time seems incredible but for the fact that the evidence conclusively establishes that the entire business was conceived in fraud, and was carried on for no other purpose. At the time of the organization respondent owed over $118,000 to banks in Little Rock, secured by fraudulent warehouse receipts for cotton which he did not own, and which had no existence,

and this debt was paid off by the cotton company. Most of the cotton seems to have been purchased in El Dorado, Ark., where the respondent Lake and one Smith, cashier of the bank at El Dorado, owned a cotton compress built with the money furnished by the cotton company. Drafts would be drawn by Lake on the bank at El Dorado, not only for business purposes, but also for every other purpose requiring money, including his individual expenses, and for any other purpose that he might want it. The cashier of the bank at El Dorado would draw on the corporation, and in most instances specify that these drafts were for cotton purchased, attaching thereto warehouse receipts issued by the compress company. Upon depositing these warehouse receipts with the banks in Little Rock as security, they would advance him the money to pay these drafts. The warehouse receipts for about 8,000 bales of cotton thus issued by the compress company and hypothecated with the banks in Little Rock during that season were fraudulent, and represented no cotton whatever. These warehouse receipts would be delivered to the railroad companies as cotton on hand in the compress, and the agents of the railroad company would issue to Lake bills of lading therefor, which bills of lading would be attached to drafts drawn on mills in the East to whom cotton had been sold by the cotton company, and these would be deposited in the bank at Little Rock as credits. As the warehouse receipts represented no actual cotton, but were fraudulently issued, of course no cotton was actually delivered.

The questions of law which will govern the court in determining the facts are well settled. On behalf of the respondent it is urged that, to warrant a finding against respondent, the evidence must be beyond a reasonable doubt; that in view of the fact that, if an order is made requiring the respondent to pay over money, and he fails to comply with it, he will be imprisoned for contempt of court, it is urged that the proceeding must be treated as a criminal proceeding, and be governed by the same rules. This court cannot assent to this proposition. If the fact that a failure to comply with the order of the court may result in imprisonment of the respondent for contempt makes it a criminal case, many proceedings, and especially proceedings in courts of equity, would have to be treated as criminal proceedings. The failure on the part of a defendant to execute a conveyance decreed by a court of equity in a proceeding for specific performance may be enforced by imprisonment as for contempt. Refusal to answer interrogatories in a bill of discovery, refusal to pay alimony in a divorce suit, disobedience to a writ of mandamus, or violation of an injunction may result in such punishment; but no one will contend that for this reason such proceedings are in the nature of criminal actions. The punishment for contempt in bankruptcy proceedings is simply for disobedience of the judgment of the court after it is found that the respondent has money or property belonging to the bankrupt estate in his possession or under his control, and, although able to comply with the order of the court, willfully refuses to do so. These provisions in the bankruptcy act, authorizing courts of bankruptcy to enforce

obedience to their orders by punishment as for contempt are neither novel nor unusual. They were included in every bankruptcy act, and similar provisions have been enacted by almost every state in the Union, including the state of Arkansas. In proceedings supplemental to or in aid of executions courts are authorized by these statutes to enforce the surrender of assets subject to execution, and for this purpose may commit to jail any person refusing to comply with such order. In this state section 3312, Kirby's Dig. St. Ark., contains such a provision. And by sections 61 and 62, Kirby's Dig., probate courts are authorized to enforce their orders for the surrender of property belonging to the estate of a deceased person by attachment. These statutes have been uniformly sustained as civil proceedings. Without citing the numerous decisions to that effect, it is sufficient to refer to the decisions of those courts whose judgments are binding on this court. Ex parte Boyd, 105 U. S. 647, 26 L. Ed. 1200; Schweer v. Brown, 130 Fed. 328 (Cir. Ct. App., 8th Circuit); Welsh v. Lloyd, 5 Ark. 367; Senter v. Mitchell (C. C.) 16 Fed. 206—the latter decided by this court, Judge Caldwell delivering the opinion. The true rule to govern courts in proceedings of this kind is that laid down by Judge Sanborn in Thallmann v. Thomas, 111 Fed. 277, 49 C. C. A. 317, in relation to reformation of instruments, that the relief will not be granted for mistakes "unless the mistakes are established by evidence that is plain and convincing beyond a reasonable controversy." So in the case at bar, if the court is satisfied from the evidence which is "plain and convincing beyond a reasonable controversy" that the respondent, as the managing officer of the cotton company, has in his possession or under his control moneys belonging to the bankrupt estate, it is its duty to require him to pay it over to the trustee, and, if he fails or refuses to do so, to punish him as for any other contempt. The evidence in this case is, to the mind of this court, conclusive that there are large sums of money belonging to the estate which came to the hands of the respondent, and which have not been accounted for. If the money is once traced into the hands of a respondent, the burden is upon him to make some reasonable explanation of what became of it, or at least that it has ceased to be in his possession or under his control at the time the order to turn it over is made. In re Schlesinger (D. C.) 97 Fed. 930, affirmed in 102 Fed. 117, 42 C. C. A. 207; In re Finkelstein (D. C.) 101 Fed. 418; In re Meyers (D. C.) 96 Fed. 408; Ripon Knitting Works v. Schreiber (D. C.) 101 Fed. 810. The opportunity of the respondent to make all necessary explanations was given to him in an examination had before the court, which was begun on January 28, 1903, immediately after the bankruptcy proceedings had been instituted, and within a very short time after these transactions had taken place. All the facts were then fresh in his memory, and his failure to make the necessary explanations showing what had become of the large sums of money which had been traced into his possession must be accepted as conclusive that he was either unwilling or unable to do so. When asked in relation to transactions involving thousands of dollars, which had taken place only a few weeks before the examination,

his stereotyped answer was, "I can't remember." The remarks of Judge Brown in Re Schlesinger (D. C.) 97 Fed. 930, are peculiarly applicable to the case at bar.

Guided by these rules, the court finds that he should be charged with the indebtedness of the concern, less such sums of money as may have been accounted for by some evidence. Taking the items which are charged as debits or appear as credits on the statements prepared by the two accountants, we find some conflict, but a careful examination of all the testimony induces the court to make the following findings as to the different items: The accountant for the trustee charges respondent with capital stock paid in $11,538.05. Respondent's accountant makes no such charge. There were some memoranda which would indicate that there was some money paid in by respondent on the capital stock of the corporation, but, in view of the peculiar conditions surrounding this case, the court does not believe that there was ever one dollar of the capital stock paid in, and for this reason will not charge respondent with that sum. The credits to which he will be entitled are, first, old debts which had been contracted by the respondent when he was in the cotton business for himself, and before the corporation was formed. This amount is found by the accountant for the trustee to have been $118,194.41, while, on the other hand, the accountant employed by the respondent makes that item $156,708.53. While some of the items credited in the last-stated account are somewhat doubtful, yet the court, acting upon the principle that every doubt should be resolved in favor of the respondent, will adopt the latter amount, and credit respondent with that sum. This includes every item claimed by respondent or shown by the testimony of Smith, the cashier of the El Dorado bank, or found from any other source, to have been paid out on debts contracted prior to the organization of the cotton company. As to losses sustained during the short period of the existence of the cotton company, after careful examination of the testimony the court adopts the amounts found by the accountant for the trustee, $79,108.30. That account includes all interest and exchange paid out, the salaries of all employés, and other expenses connected with the business, and also $8,028.50 losses sustained in dealing in futures, and $8,006.50 drawn by respondent for personal expenses in less than five months. Of the assets of the concern it appears that the sum of $20,293.45 is due from the Union Compress Company, a corporation practically owned by respondent and the cashier of the El Dorado bank. There is evidence tending to show that some of the items charged to this account were not properly chargeable to the compress, but were really connected with the cotton business, but the court will treat the entire claim as one of the assets, and credit it accordingly. Another of the assets is an indebtedness due the cotton company from the Union Dry Goods Company, amounting to $2,248.32. This was a concern which was practically owned by the respondent. It is hardly necessary to say that neither of these items is of any value; in fact, they are absolutely worthless. The other assets amount to $1,368.89, of which one item of nearly $800, amount due from a

bank, is shown to have been erroneous; but in view of the fact that the evidence on that subject is not convincing the court will permit that to stand. Thus we find the account to be as follows:

**Dr.**

| | |
|---|---|
| To debts..................................................... | $381,636 93 |

**Cr.**

| | | |
|---|---|---|
| By old debts paid................................ | $156,708 53 | |
| Losses in business................................ | 79,108 30 | |
| Compress ........................................ | 20,293 45 | |
| Dry Goods Company................................ | 2,248 32 | |
| Other assets...................................... | 1,368 89 | 259,727 49 |
| Leaving the balance unaccounted........................... | | $121,909 44 |

The only explanation of this deficiency that has been advanced is that the drafts for cotton drawn by the cashier of the El Dorado bank and clerks employed in buying cotton were paid by respondent in good faith, believing that the cotton was actually bought, when in fact no cotton was bought, and the warehouse receipts were fraudulently issued. If this is true, it would certainly relieve respondent of all liability in this proceeding. The mere fact that he was guilty of negligence in paying drafts for such large sums, without making any investigation whether the cotton was actually purchased, would not justify the court in finding that he had possession or control of this money. But do the facts warrant the court in adopting this explanation? The cotton company carried on its business at El Dorado, Ark., and the city of Little Rock, Ark. Respondent was most of the time in the city of Little Rock, where probably 40 per cent. of the cotton handled by the company was purchased, but visited quite frequently the town of El Dorado. As stated before, he was practically the owner of the compress company which issued those warehouse receipts. The town of El Dorado has about 3,000 inhabitants. Is it reasonable to suppose that respondent, when at El Dorado, spending there several days on some of the visits and a day or two on every visit, would not go to the compress for the purpose of examining it and making some examination of the cotton supposed to be on hand? A deficiency of nearly 8,000 bales would be apparent at once. That number of bales would cover at least an acre of ground. How, then, could he have helped notice, after having paid for so much cotton, that there was something wrong? But, if there were any doubt in the mind of the court on that subject, it would be removed by the fact that the same frauds had been perpetrated by respondent the preceding year, before the corporation had been organized as heretofore stated. That the cotton represented by the warehouse receipts carried by the banks of Little Rock for moneys loaned during the cotton season of 1901–02 was not in the warehouse at El Dorado certainly was known to respondent, for, if there was no cotton there when nearly 4,000 bales should have been, a man who visited the warehouse, as it is shown respondent did in the summer of 1902, could not help but notice it.

Taking all the circumstances surrounding this case into consideration, the court cannot avoid reaching the conclusion that respondent well knew that when these drafts were drawn on him and the warehouse receipts sent to him they were fraudulently issued, and did not represent actual cotton. The clerk who was in charge of the compress, and who drew some of the drafts, has disappeared, and cannot be found, although strong efforts have been made to find him, not only for the purpose of having him testify in this case, but also for the purpose of having him appear as a witness in criminal proceedings pending in this court against the respondent, arising out of these transactions. The cashier of the El Dorado bank has testified, but his testimony does not impress the court strongly. He admits that the books of the bank were not correctly kept, and do not show all the transactions between it and the cotton company. In addition to that, the respondent and Smith testify that respondent would draw at Little Rock for large sums of money on the Bank of El Dorado with which to pay personal expenses, many of the business expenses, and also freight bills on cotton received and shipped; that these drafts, when paid by the Bank of El Dorado, would be included in drafts that they would draw for cotton. In many instances, involving very large sums, no entries would be made on the books of the bank. The court has no doubt that for every draft thus drawn by the Bank of El Dorado the cotton warehouse receipts would be attached to it, in order to make it appear that the drafts were drawn in payment of cotton, instead of for moneys advanced to respondent, and thus enable him to secure the money to pay them from the banks, or bills of lading from the railroad company.

It also appears in evidence that on the 24th of December, 1902, a short time before the failure, and when respondent himself must have known that it was only a question of a short time before the railroad companies would discover that the bills of lading which they had issued for cotton had been fraudulently obtained from them, and which would result in an exposure of all the frauds, he visited El Dorado, and on that day the books of the bank show the cotton company was debited with cash $11,845.17. There is no satisfactory explanation of that item. Respondent denies that he obtained that money. The cashier of the bank thinks that there were some drafts paid by him or remittances made for the cotton company amounting to that sum, and he is positive that no money was paid to respondent by the bank, but the evidence is anything but satisfactory. Another peculiar circumstance connected with this item is that the payment of this sum of money balanced the account of the cotton company with that bank. According to the books of the bank, the cotton company had on that day a credit of $11,844.17, which would indicate that the payment of this item overdrew the account $1, but immediately below there is an entry by which the cotton company is credited "by error" $1, thus balancing the account to a cent. To review all the testimony would prolong this opinion unnecessarily.

There is only one other matter which the court thinks should be taken into consideration. Although there is no evidence to show that any of this money went to any other person or persons than the respondent, it is but reasonable to indulge in the presumption that those who aided him in these frauds, and without whose assistance he could not have perpetrated them, obtained some part of the fruits thereof. The fact that John Turrentine, the clerk of the compress, who issued these false warehouse receipts and drew many of the drafts on the cotton company, has disappeared, would indicate that he received some considerable part of the missing funds. The cashier of the bank at El Dorado, who manipulated everything at that place, who must have been cognizant of the fact that these warehouse receipts were fraudulent, if he did not himself cause them to be issued, who kept the account of the cotton company on the books of the bank in such manner that it is impossible to get a correct statement of the transactions between the cotton company and the bank, who was respondent's partner in the compress, probably insisted on a share of the moneys thus obtained, or appropriated a part thereof. For these reasons the court, although there is no direct testimony on the point, will assume that respondent, although in a plenary suit liable for the entire deficiency, has only one-half the money unaccounted for in his possession or under his control.

An order will be entered that the respondent pay into the registry of this court the sum of $60,954.72, being one-half of the amount found by the court to be due from respondent, and, unless said sum of money is paid within 30 days, that he be committed to the Pulaski county jail until the further order of the court, or until discharged by due process of law.