In re LEVERTON. (1.)

(District Court, M. D. Pennsylvania. September 4, 1907.)

No. 897, in Bankruptcy.

BANKRUPTCY—STATE EXEMPTION—FRAUDULENT CONCEALMENT OF PROPERTY.

A bankrupt was a general merchant in a small town, carrying an average stock of about $5,000. Within three months prior to his bankruptcy he bought goods to the value of $11,000, which he did not pay for, in addition to those then on hand; and on his bankruptcy his stock invoiced at cost price less than $3,500. During such three months not more than $3.000 in money was accounted for, and no proper books showing the business transactions were found. *Held*, that under the law of Pennsylvania, having fraudulently concealed his property he forfeited his right to his $300 state exemption.

In Bankruptcy. On exceptions to refusal of John W. Codding, referee, to allow the bankrupt his $300 state exemption.

The report of the referee was as follows:

The trustee having filed with the referee a schedule of property designated and set apart, to be retained as exempt by the bankrupt, amounting to $299.75, exception is taken by creditors to the allowance of the exemption for the reason: (1) That the bankrupt fraudulently contracted the indebtedness due them. (2) That he has fraudulently concealed and disposed of certain of his goods, merchandise, and property, for the purpose of putting them beyond the reach of creditors. From the record and evidence taken in the case, it appears that Morris Leverton, at the time the petition in bankruptcy was filed, had been conducting a general mercantile business in Du-

shore, Pa., for about twelve years. The first six years he was in partnership with Mrs. Goldstein, a cousin, and the last six years by himself. Dushore has a population of about 1,000. During the time he was in business for himself, he carried a regular stock down to September or October, 1906, of some $5,000. The bankrupt is about 33 years of age, had apparently been successful in business, and until shortly prior to the bankruptcy proceedings had a good financial standing, and he seems to have been able at the close to get unusual and almost unlimited credit The evidence does not show all the new goods that he purchased during the year 1906, but it does show substantially the new goods that he purchased and received during that year, which he did not pay for. The latter appears from the proofs of claims filed, the indebtedness set forth in his schedules, and the records of the freight and express offices at Dushore.

Of goods, for which claims have been proved, he purchased and received as follows:

| | |
|---|---:|
| Prior to August, 1906 | $3,115 00 |
| During August, " | 1,572 75 |
| During September, " | 3,410 18 |
| During October, " | 5,985 63 |

The purchases for September and October were unusually large for him as appears from the number of shipments and packages which he received during these two months as compared with the corresponding months of 1905.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| In September, 1906, | express, | 38 | shipments, | 38 | packages, | 918 | lbs. |
| | freight, | 27 | " | 45 | " | 5762 | " |
| In October, 1906, | express, | 139 | " | 139 | " | 3795 | " |
| | freight, | 51 | " | 78 | " | 6900 | " |
| | | | | | | 17,375 | |
| In September, 1905, | express, | 4 | shipments, | 4 | packages, | 62 | lbs. |
| | freight, | 14 | " | 21 | " | 2620 | " |
| In October, 1905, | express, | 12 | " | 15 | " | 587½ | " |
| | freight, | 15 | " | 21 | " | 2650 | " |
| In November, 1905. | express, | 22 | " | 22 | " | 1362 | " |
| | freight, | 14 | " | 16 | " | 2910 | " |

In place therefore of the stock of $5,000 which he regularly carried Leverton had goods to the amount of $14,385.81 during the last two months of his business.

The petition in bankruptcy was filed October 30, 1906, and a receiver was appointed and took possession of the store November 1st; an adjudication being made November 10th following. When the bankrupt went out of business, there was 57 cents in the bank to his credit, and the stock of goods in his store, which was badly broken up, was appraised at $3,410.01. The appraisers knew the cost marks on his goods, and all new goods which were found were appraised at the cost price.

The total payments made by the bankrupt during the months of September and October were as follows:

| | | |
|---|---|---:|
| Cash. | General expenses, running house, store etc. | $ 303 08 |
| | Freight and express, estimated at | 200 00 |
| | Paid note at Bank | 150 00 |
| | Claims to have paid for gold stock | 1,250 00 |
| | Claims to have paid L. Paltrowitz | 450 00 |
| | | $2,353 08 |
| Checks | | 270 09 |
| | | $2,623 17 |

This amount, viz., $2,623.17, subtracted from the $14,385.81 of goods which he had in his possession during these two months, leaves $11,762.64 to be accounted for.

The bankrupt did all of his banking business at the First National Bank of Dushore; and his bank account for 1906 was as follows:

| | | |
|---|---|---:|
| Balance in his favor, December 29, 1905 | $ | 781 24 |
| Deposits. January | | 414 13 |
| February | | 145 80 |
| March | | 1,060 55 |
| April | | 574 56 |
| May | | 892 66 |
| June | | 501 78 |
| July | | 414 77 |
| August | | 332 50 |
| September | | 70 00 |
| October | | 120 00 |
| | | $5,307 99 |
| Checks from January to October | | 5,307 42 |
| | $ | 57 |

The last deposit in bank was October 5, 1906.

After deducting, therefore, all general expenses of house, store, advertising, freight, and express, note at First National Bank of Towanda, and what he claims to have paid for gold stock and to Paltrowitz, he should have either in goods or money $11,762.64. The goods left in the store as already stated were appraised at $3,410.01. But, stating this the most favorably to the bankrupt, suppose the goods amounted to $5,000. This deducted from $11,762.64 would leave $6,762.64 of assets entirely unaccounted for. The question is: What has become of it? This puts the matter as favorably to the bankrupt as possible, for it treats the gold stock and the Paltrowitz transactions as actual payments. But they were both disputed and of a suspicious nature. The goods sold to the Kaufmans, not deducting the 10 per cent. discount which he allowed them, amount to $1,490.13; and the goods sold on credit in September and October, according to the ledger, amount to $76.60, making $1,566.73 altogether, although the bankrupt reports no money in his schedules excepting $0.57.

Now, as to his books, bills, receipts and other papers: Two days before the receiver was appointed the bankrupt took these bills, and used them to make up a list of creditors, which he furnished his attorney. He testified that they were all left in the store. But Ira Cott, the receiver, and Charles Heverly, one of the appraisers, swear that they made a thorough search for books and papers, but found absolutely nothing. And the books when finally produced are very unsatisfactory, and the most important ones are not produced at all. It does not seem possible that a business of the character of this one could be carried on with books kept in the manner that the bankrupt alleges his books were kept. A most diligent search was made for the bills, and, after considerable delay, Henry Goodman, the trustee, produced 17 of them; and, strange to say, in every instance the goods on the bills produced have been returned to the shipper. This was no accident. It is hardly possible that there were no original bills outside of these 17, all of which cover goods that had been returned. There was evidence, also, that the bankrupt wholesaled goods to the Kaufmans at a discount of 10 per cent., when he himself received no such discount. These shipments were all made a short time before his failure, and on the face of the transaction he was a heavy loser. Nor have any reasons been assigned for this undue haste and large inadequacy of price. During the month of October, also, many goods were purchased by the bankrupt on a hurry-up order and immediately reshipped to one or the other Kaufman. Many of these goods were also ordered to be shipped by express, instead of freight, which was much more expensive. Unusual goods to carry in a small town, like silk petticoats, of peculiar sizes and of the best silk, were received, and claimed by him to have been left in the store, and yet the appraisers were unable to find them. On October 18th and October 27th he also received three seal jackets costing $40, $38.50, $29.50, respectively. And yet he is utterly unable to tell to whom he sold these jackets two months after they were purchased. There are many circumstances of this character of a

suspicious nature tending to show concealment of property. But enough have been given.

The bankrupt in his examination has been most unsatisfactory, evidencing a disposition to dodge, give evasive answers, and hide behind the statement, "I do not remember." And this concerning transactions of importance that any ordinary business man would have no trouble in recalling so soon afterwards. It is well settled that a bankrupt is to be allowed the same exemption as provided by the law of the state wherein he resides. But in Pennsylvania, if a debtor conceals his property for the purpose of defrauding his creditors, he forfeits his right of exemption. It was an enactment for the honest poor, and not for the roguish. Authorities to this effect are numerous.

The referee is therefore compelled to find that the bankrupt has concealed his assets for the purpose of defrauding his creditors, and that his exemption must be denied.

The bankrupt filed exceptions.

Rodney A. Mercur and William Maxwell, for the bankrupt.
J. C. Ingham, for creditors.

ARCHBALD, District Judge. The referee has refused to allow the bankrupt his $300 state exemption because of the fraudulent concealment of assets. There can be no question of the propriety of this action if the facts warrant it. In re Yost, 9 Am. Bankr. Rep. 153; In re Alex, 15 Am. Bankr. Rep. 450. The exemption given by the law is intended for the unfortunate, and not the dishonest, debtor. Strouse v. Becker, 38 Pa. 190, 80 Am. Dec. 474; Imhoff's Appeal, 119 Pa. 350, 13 Atl. 279. But the finding of fraud is challenged. And the question is whether the evidence justifies it. A careful consideration of the case satisfies me that it does, and that the referee was entirely right in the disposition made of it. The truth is, notwithstanding the contention of counsel, that the fraud is too glaring to be defended. A small trader, in a country town of about 1,000 inhabitants, enjoying fair credit, by extraordinary orders far beyond his needs and triple those of previous seasons, in the space of three short months, gets together, in small lots, from all over the country, some $11,000 worth of goods, in addition to those which he had on hand; and then, upon being pressed by creditors, and forced into bankruptcy, turns up with a mere fraction of the stock so secured, the rest having been disposed of in some unexplained way, with practically nothing to show for it. No books are produced to throw light upon the transaction, except some very minor and meager, not to say manufactured, ones; nor, if there were others, as is more than likely, is their disappearance accounted for. Left in the store, says the bankrupt, but the receiver was unable to find them, searching diligently, and that one or two have turned up since in the hands of a friendly trustee does not help the situation. A special cash sale, largely advertised, with extra clerks, conducted night and day, for over three weeks, from which no money is deposited in bank, and no merchandise creditors paid, is a part of the story; while large sales in bulk to convenient relatives at less than cost, and goods shipped away by night, on at least one and probably several occasions, are other features. There are also minor matters of more or less significance, such as expensive and unusual goods purchased and unaccounted for, which do not need to be specifically alluded to.

That the bankrupt is called upon to explain, there can be no question. In re Alex, 15 Am. Bankr. Rep. 450; Lesser v. Driesen, 2 Lack. Leg. N. (Pa.) 343. And he attempts to do so; but his explanation is utterly unsatisfactory, not to say lame and shifty. Payment of bills is claimed, but there are none worth mentioning for merchandise after August. Business and family expenses are also set up; but, even if the referee has cut these down beyond what might be, they are by no means vouched or to be allowed to the extent contended for. There is also an alleged purchase of gold stock by the bankrupt, which he claims to have paid $1,250 for, in cash, in October, to his cousin Harry Kaufman. But, aside from the certificate, which bears date in November, and notwithstanding that he took receipts for the payments, there is nothing but his own statement to substantiate it. And the purchase was at a time when he was selling his goods as fast as he could in order to get money, as he says, to meet the demands of creditors, of which he now wishes to make out that he was solicitous. Great stress is laid on the testimony of the bankrupt that the stock which he had at the close amounted to $8,000, and this enters into every showing that is sought to be made in his favor to which it is essential. But the idea that the depleted and broken up odds and ends which were found by the receiver had anywhere near that value is preposterous. According to the first appraisers, who seem to have known the cost marks and followed them as to new goods, there was but $3,400 worth, of which $432 was for cash register and fixtures, and this was still further reduced by the trustee's appraisement to $2,400; the amount realized at the sale being $2,282. The referee, out of abundant caution, allows $5,000, which is certainly liberal, and still finds nearly $7,000 worth of goods unaccounted for; nor is he out of the way in estimating the stock of the bankrupt before he got in his extraordinary purchases at another $5,000. It is said that the only evidence upon the subject is the statement of the bankrupt, who puts it at $3,000. But his usual line was from $5,000 to $6,000, and he admits that from January to August he was carrying the average, which warrants the conclusion that he had that quantity on hand at the close of that period. The importance of these amounts is manifest, particularly the latter; for it is only by putting the stock at $3,000 before the August, September, and October goods came in, and calling it $8,000, when the bankrupt went out of business, that counsel rely to figure him out of his dilemma. The thing that stares us in the face, after all has been said, is that within three months or less he got $11,000 worth of goods, in addition to what he had on hand, whether $3,000 or $5,000, making from $14,000 to $16,000 in all, of which $6,000 was received in October, when affairs were drawing to an end; by far the larger part also being shipped by express instead of freight, presumably by his direction, showing the anxiety to get them, as well as the disregard of expense in doing so. The question is what became of all this accumulation in the little time it was in his hands. Have the goods, he certainly did; and within the time mentioned, as the claims against him conclusively prove. Nor does it matter that some of them may have been ordered in the spring and summer. It is when he got them, and not when they were ordered, that counts in this reckoning. Neither

are we concerned with what he paid out, or what expenses he may have been under, before that. By no possibility could this come out ot what he did not get till afterwards. It is of no consequence, therefore, that merchandise bills to the extent of $3,500, as vouched by his bank checks, were liquidated from January to August, going back to this date, as urged by counsel. It tells nothing as to what was done with the goods received from August to October to know what was paid out on merchandise or anything else up to that time.

Specifically stating, then, the case that is made out against the bankrupt, he is chargeable with the goods which he had and with those which came into his hands, worth from $14,000 to $16,000 at wholesale, to say nothing as to his profits upon them. On this he is entitled to credit for the value of the stock found in the store after he left it. And, assuming this to be as much as he had before the other goods were added to it, it leaves $11,000 or practically the amount of his extraordinary purchases. Out of this is to come the $270 deposited in bank and checked out during the contested period. And there was also a note of $150 at the First National Bank of Towanda which was taken care of. The general expenses of household and store are also to be allowed which—somewhat more than the referee—I have estimated at from $300 to $500. And freight and expressage were further paid to the amount of about $200. Sixty-six dollars and twenty cents worth of goods were also sold on credit, and not paid for; and $94.65 of others were returned, not having arrived until after the failure. If to this is added the $1,250 claimed to have been paid by the bankrupt for gold stock, which, upon any close consideration of the case, might not pass muster, and the $450, said to have been paid, through his wife, to Paltrowitz, his wife's relative, at Elmira, for borrowed money, which is open to even greater question, the total aggregate is only from $2,800 to $3,000, leaving a discrepancy, according to this, of over $8,000. The bankrupt's uncles, M. and B. Kaufman, to be sure, got a large amount of this—some 39 per cent. by weight, which is charged on the books, after allowing 10 per cent. discount, at $1,342, but, taking the weight, was probably three times that. But the Kaufmans paid cash for whatever they got, according to the story, so that it does not affect the outcome, the bankrupt being chargeable with the money or the goods, whichever way you look at it. The same is to be said of the cash taken in at the October sale, which is entered on the books at $2,291.17, the bankrupt thus from these two sources alone getting over $3,500 which he apparently holds onto. But without regard to this, upon the best showing which can be made, as already pointed out, some $8,000 worth of goods have disappeared—by which, it will be observed, I increase, instead of reduce, the referee's findings—as to which the only conclusion to draw is that the bankrupt has made away either with the goods themselves or the proceeds, which he withholds and conceals from his creditors. The exemption given by the law was never intended for any such character of debtor.

The exceptions are dismissed, and the report of the referee is confirmed.