### In re LESAIUS.

(District Court, M. D. Pennsylvania.  August 18, 1908.)

#### No. 849.

1. BANKRUPTCY—ORDER ON BANKRUPT TO SURRENDER PROPERTY—EVIDENCE TO WARRANT.

In determining whether or not a bankrupt merchant has property which he conceals and should be required to turn over to his trustee, where he did not keep books showing his business transactions, the court may properly take into account goods which he is shown to have had on hand at a date shortly prior to his bankruptcy and such as he afterward bought, and charge him with such as are not reasonably accounted for.

**2. SAME—NATURE OF ORDER.**

Proceedings to require a bankrupt to turn over property to his trustee are directed to the recovery of specific property, and, where it is found that he has withheld property from his estate, the order should require him to return such property, describing it is particularly as practicable; a general description being sufficient in the case of merchandise.

**3. SAME.**

A bankrupt merchant kept or produced no books from which his business transactions could be ascertained, but he made a statement, six months prior to his bankruptcy, giving the value of his stock, which he testified was based on an inventory then taken; and he was shown to have purchased goods afterward, which made the value of his stock so on hand and purchased before the bankruptcy about $15,500, more than $4,000 worth of which was wholly unaccounted for. He was shown to have stated to a creditor that he had the money in his pocket, and shortly after his bankruptcy he started a new store in the name of his father which he conducted as manager; his father being a foreigner ignorant of the English language and working for a dollar a day, in which store goods were found which had been sold to him prior to his bankruptcy. *Held,* that such evidence was sufficient to show that he had fraudulently concealed goods to the value of at least $4,000 or their proceeds, and to justify an order requiring him to turn the same over to his trustee.

In Bankruptcy. On certificate of W. L. Hill, referee, sur rule on bankrupt to turn over certain property.

C. A. Van Wormer and M. S. Kaufman, for trustee.
Ralph L. Levy, for bankrupt.

ARCHBALD, District Judge. On petition of the trustee, a rule was entered on the bankrupt to show cause why he should not turn over certain property which was charged to be in his possession, and which he refused to account for. This rule has been pending nearly two years, a delay which is not creditable to those who are responsible for it; certain books and papers also to complicate the matter having disappeared meantime. The referee discharged the rule, being of opinion that, while there was strong suspicion that the bankrupt had property which he withheld, there was not enough evidence to warrant an order. There is no discussion, however—nothing, indeed, but the bare ruling—and the case is therefore to be disposed of without reference to it.

On June 30, 1906, the time the proceedings in bankruptcy were instituted, Frank P. Lesaius, the bankrupt, was conducting a gentlemen's furnishing and clothing store at Providence, in the North End of Scranton, Pa. Until some time in the preceding April, he had had a second store at Pittston, some 10 miles distant, but a fire had occurred there April 5th, and, after adjusting the loss and having a so-called "fire sale" there for a couple of weeks, he moved what little was left of the stock to Scranton. In neither store did the bankrupt keep the usual store books, or, at least, if he did, except one or two they have not come into the hands of the trustee, and we are therefore left without the light which they would throw on the business, for which if any injustice results to the bankrupt therefrom, he will have no one but himself to blame for it. According to the schedules filed by the bankrupt, the stock in the Scranton store turned over to the

trustee was worth approximately $3,200 and the fixtures $300, making $3,500. The appraisers put a valuation of $2,721.12 upon both together, and they realized only $1,460 at public sale, after allowing the bankrupt his $300 state exemption. He also told the trustee that the stock was made up of odds and ends, and that he would not give $700 for it, all of which throws serious doubt upon the estimate given in the schedules. He further claimed to have $3,000 of outstanding accounts due from customers, divided about equally between the Pittston and Scranton stores. But except as to $588.60, appearing on memorandum slips kept by the bankrupt, there is nothing but his say-so to verify it. This, with two life insurance policies of $2,000 each in favor of his family, constitutes the whole of the bankrupt's available property.

In a statement made by the bankrupt to R. G. Dun & Co.'s Mercantile Agency six months previously he valued his stock on January 1, 1906, in the Scranton store at $6,397.29, and in the Pittston store at $2,987.90, or a total of $9,385.19, not a large amount for two stores, nor beyond that which he is shown to have regularly carried. Taking out his liabilities, which were some $5,900, he made out that he was worth the difference, $3,400. It is said that statements to mercantile agencies for the purpose of securing a financial rating are usually inflated, and are not to be relied on in consequence. This is not the view taken in Re Greenberg (D. C.) 8 Am. Bankr. Rep. 94, 114 Fed. 773, but quite the contrary. But, whatever grace of this kind is ordinarily to be extended to such statements, it is testified by the bankrupt in the present instance that, before sending in the one in question, he took an inventory, and, upon his attention being directed to the figures given in the statement, he reaffirmed their accuracy. It is also urged that they included bills due from customers; but he distinctly swears that they represent stock on hand. And as his total assets are stated at $10,010.19, which is $725 more than they aggregated, the accounts which he considered good—with regard to which he says that he endeavored to be conservative—may be taken to make up the difference. Since January 1, 1906, it is clearly established that his stock was augmented by merchandise to the extent of $6,111.95; this being proved by the invoices on file in his store, which were also submitted to him and their authenticity acknowledged. Putting together the amounts so shown, it makes a total of $15,497.14, which thus represents the merchandise which was in the bankrupt's hands at one time or another, from January 1, 1906, to the date of his bankruptcy, to say nothing of the $200 or $300 worth which he says that he bought for cash at the close when he no longer had any credit. The question is how far it has been accounted for.

To get at how much by right should have been left at the last to be turned over to the trustee, the sales meanwhile are, of course, to be credited; which, had the usual books been kept, would appear by the merchandise account; but, in the absence of it, may be taken to be fairly represented by the cash received and paid out on trade accounts and for business and personal expenses, and the bills due for goods sold on credit. It is true that there was a fire in the Pittston

store in April, but the damage was not much, being mainly from smoke and water, and was no doubt covered by the insurance money received—some $940—especially as this was followed by a "fire sale" for several days, which proved so successful that goods were carted down from the Scranton store to get the benefit of it, and, according to Goodman, resulted in nearly the whole of the Pittston stock being disposed of. Corroborative of this, it may be added that while just before the fire Lesaius declared to Goodman that he was in difficulty, and would have to fail, and wanted the name of an attorney who would help him through, after it had occurred he came to Goodman again and said that he would not need an attorney, as he was going to get through on his insurance money. This money also in part at least was used to buy goods again, and to the extent that it was it got back into the business. The alleged loss by fire would therefore seem to be negligible.

An account may therefore be stated against the bankrupt, as follows: He is to be charged with:

| | |
|---|---|
| Goods on hand January 1, 1906, as per statement to R. G. Dun & Co. | $ 9,385 19 |
| Merchandise received from Jan. 1, 1906, to June 30, as per invoices on file | 6,111 95 |
| | $15,497 14 |

And he is to be credited with:

| | | |
|---|---|---|
| Payments on trade accounts as per checks and notes.. | $5,137 61 | |
| Business expenses, including rent of Pittston and Scranton stores, clerk hire, insurance, and gas bills | 1,387 25 | |
| Goods sold on credit as per memorandum slips on file.. | 588 60 | |
| Drawn out or paid on personal account | 790 17 | |
| Goods sold after bankruptcy proceedings had been instituted | 300 00 | $ 8,203 63 |
| Balance | | $ 7,293 51 |

Or, in other words, allowing every proper item of credit to which the bankrupt is entitled, he should, according to this, have had stock and merchandise to turn over to his trustee of the value of $7,293.51, where at his own figures he had only $3,200, or on a more correct estimate probably not to exceed $3,000, a discrepancy of from $4,100 to $4,300.

There is no escape from the inexorable logic of these figures; and that we have a right to resort to them there can be no question. In re Salkey, 9 N. B. R. 107, Fed. Cas. No. 12,252; In re Schlesinger (D. C.) 3 Am. Bankr. Rep. 342, 97 Fed. 930; In re Deuell (D. C.) 4 Am. Bankr. Rep. 60, 100 Fed. 633; In re Greenberg (D. C.) 8 Am. Bankr. Rep. 94, 114 Fed. 772; Boyd v. Glucklich, 8 Am. Bankr. Rep. 393, 408, 116 Fed. 131, 53 C. C. A. 451; In re Gerstel (D. C.) 10 Am. Bankr. Rep. 411, 123 Fed. 166; In re Dry Goods Co., 13 Am. Bankr. Rep. 266, 133 Fed. 100; In re Cotton Co. (D. C.) 14 Am. Bankr. Rep. 194, 134 Fed. 477; In re Weinreb, 16 Am. Bankr. Rep. 702, 146 Fed. 243, 76 C. C. A. 609; In re Leverton (D. C.) 19 Am. Bankr. Rep. 426, 155 Fed. 925. Otherwise, indeed, in many cases

we should be without remedy. In some respects, moreover, they are more favorable to the bankrupt than perhaps he is entitled to. For instance, while charging him with goods at wholesale or cost prices, he is credited with sales at retail without taking into account the supposed profits which were no doubt considerable. Also he is allowed credit for the forced sales made after the bankruptcy proceedings had been instituted, amounting to some $300, instead of being charged with these, together with $100 drawn out of bank immediately preceding that, as so much money received and unaccounted for, the only explanation of where it all went to being the contemptuous one that he had "spent it nicely," or that it had gone for "car fares," "shoe shines," or "milk for the baby." And, again, he is not charged, as he well might be, with the goods bought for cash after his credit was gone, to which allusion has already been made, amounting to some $200, this having at the same time been allowed on the other side as a deduction. On the other hand, no credit has been given for the fixtures, estimated at $300; but there is reason for this, the fixtures not being merchandise nor paid for out of it, and this being a purely merchandise accounting.

It is urged on behalf of the bankrupt that there were $3,500 of book accounts—$1,500 at Pittston and $2,000 at Scranton—which, if allowed, would be almost enough of themselves to overcome the deficiency shown by the figures. But except to the extent of the memorandum slips which have been considered and allowed—$588.60—the existence of any such accounts is exceedingly doubtful. And, even if this were not so, there is nothing to show how long they had been accumulating, and it is only as they represented sales made since January 1, 1906, from which everything runs in this accounting, that they would be of any relevance. It is also said that the stock which the bankrupt had on hand in January, 1906, included old and shelf-worn goods, on which a deduction should be made of at least 20 per cent. in order to make the estimate a fair one. This may be possible, but unfortunately there is nothing to substantiate it, and, on the contrary, it appears, as already pointed out, that the statement to R. G. Dun & Co., against which this is directed was based on an actual inventory, where the condition of the goods is supposed to have been taken into consideration. It is also to be noted in this connection, as it already has been in another, that, while the bankrupt is charged with the goods traced into his hands at cost, he is credited with what he got for them, thus giving him the benefit of the profits made, which on $6,000 or $7,000 of stock disposed of may well be taken to offset any depreciation on the rest of it, if, indeed, this is not too liberal. A point is also sought to be made as to the running expenses, which amounted as it is said to $135 a month for four months at Pittston, and $275 a month for six months at Scranton. But into the Scranton estimate $75 a month is figured for the bankrupt himself, which is, of course, unwarranted; and the rent of the Scranton store, which was $50 a month, is also included, which the checks show was fully paid, as were the gas bills and a large part of the clerk hire, all of which the bankrupt relies upon as part of the expenses which he would

have deducted, but have already been taken into consideration in the credits given. The alleged loss by the Pittston fire is also brought forward, but has been disposed of in what is said of it above. And there is finally claimed to be a discrepancy of over $1,200 in the amount at which the goods traced into the bankrupt's hands during the six months immediately preceding his failure are figured by the trustee beyond what they should be according to the evidence. But I have carefully gone over the items relied on by the trustee, and the amount is to be increased rather than lessened.

Where, then, has the stock disappeared to which is not accounted for? Nothing, of course, is to be made out of the dray load of goods which the policemen saw being carted away from the Scranton store in the nighttime. This was in April, and is explained by the bankrupt as having been taken to Pittston after the fire to mix with the other goods and be disposed of to customers eager for supposed bargains, according to the practice which is sometimes indulged in. Neither is there anything that can be laid hold of in the evidence of overcoats and clothing being taken to the house of the bankrupt's father where they were seen by boarders, which was also in April. Nor is any stress in my judgment to be put on the checks given from time to time by the bankrupt to his brother, R. A. Lesaius, a prosperous retail butcher, in the same section of the city. The giving of these checks extends several months back of the period which is under surveillance, and is explained as a custom adopted by the brother for taking care of his bills without having to do any banking; the money being given to the bankrupt in exchange for his checks and the checks being used to pay with. This was certainly a peculiar practice, but, independent of the bankrupt or his brother, there is evidence to corroborate it, and there is no occasion, therefore, to call it in question. Much more significant is it that the bankrupt, after a few months interval, started up again in the same business ostensibly as manager for his father—a foreigner ignorant of our language and customs, working for a dollar a day in a coal breaker—on money said to have been borrowed from different members of the family. No doubt the business is carried on in the father's name, in which goods are bought and sold, and checks given. But the bankrupt dominates and controls it, and the father is evidently a mere figure-head, with whom in all this time there has been no accounting. As the bankrupt significantly says, it was not necessary. Into this store, moreover, are traced goods which were sold to the bankrupt before his failure. Goodman, for instance, saw some of his shirts there and a couple of boxes of balbriggan underwear, and Ackerman discovered several of his watches; all these articles being identified by unmistakable marks, and being handled solely by these parties, who have sold him nothing of the kind except what they did originally. It is true that these things do not amount to much, either in number or value, but the significance of finding them is that in no way could they have got into the new store except as they were a part of the stock of the old one, and it is fair to surmise from this circumstance that there may be others. It is suggested that they might have been bought from other retail-

ers, but this is altogether unlikely, nor does the bankrupt venture to say so. Soon after his failure, also, when Goodman was trying to persuade him to settle with his Scranton creditors, Lesaius said that he had the money in his pocket, but that he was going to beat the Jews and would not pay them a cent. And at another time, talking with Goodman, with whom he used to be quite friendly, referring to an offer of settlement which he had made him, he said that, if he (Goodman) had kept his mouth shut, he would have paid him, but that he had the "boodle" in his pocket, and after what the creditors had done in starting bankruptcy proceedings they could all go to the devil. Again, also, when Goodman was talking with him about how the stock had run down and inquiring what had become of it, pointing out that no bills had been paid, he said that his lawyer advised him to sell all the goods that he could and put the money in his pocket, intimating that he had done so. These circumstances of themselves, of course, amount to but little, and too much stress is not to be put upon what after all may have been only idle boasting, but, taken in conjunction with the other facts in evidence which they confirm, the fraudulent character of the failure is disclosed and the wide discrepancy in the stock explained, dispelling any fear of doing the bankrupt injustice by misconstruing innocent transactions or holding him liable as intended for that which was merely fortuitous. No doubt in cases of this kind an order is not to be made except with caution and upon convincing evidence lest a commitment for disobedience on contempt proceedings to follow should in effect be nothing more than imprisonment for debt which would not be justified. It is also to be kept in mind that the object is to recover tangible property, and not to punish as on indictment for a fraudulent concealment or abstrac-tion. Samel v. Dodd, 16 Am. Bankr. Rep. 167, 142 Fed. 68, 73 C. C. A. 254. But, allowing for all this, I am constrained to find that the bankrupt has in his possession and conceals from his trustee goods and merchandise, part of his former store stock, of the value of at least $4,000, which he should be required to turn over. Whether he has the goods now which is not likely, or has converted them into money which is very probable, is not material. He is not relieved from the exigency of the rule or the obligation to produce them, be-cause of having disposed of them, perchance, while the proceedings were pending. He could not get rid in this way of the process of the law, once it had been duly started. The order it may be should be to turn over the goods, and not in the alternative to pay the value, the proceedings, as just stated, being supposed to be directed to the recovery of specific property. Samel v. Dodd, 16 Am. Bankr. Rep. 163, 142 Fed. 68, 73 C. C. A. 254. But that does not prevent its being measured by its value; that being the only way to indicate the extent of it. Neither is it necessary to do more than describe the property generally, as consisting for instance in the present case of gentlemen's furnishings and clothing, such as the bankrupt was carrying. To require greater particularity would make such proceedings practically nugatory. Ripon Knitting Works v. Schreiber

(D. C.) 4 Am. Bankr. Rep. 299, 303, 101 Fed. 810. This would not be necessary even to convict upon indictment.

The referee is reversed and the rule to show cause is made absolute, a formal order to be prepared by counsel.