### In re E. I. FIDLER & SON.

(District Court, M. D. Pennsylvania.    September 16, 1908.)

#### No. 996.

BANKRUPTCY—CONCEALMENT OF PROPERTY BY BANKRUPT—EVIDENCE CONSIDERED.

Bankrupts, who were partners conducting a clothing store, within the three months preceding their bankruptcy purchased goods of the value of $8,100. The managing partner estimated the value of the stock previously in the store at $5,000, and about the same amount, or a little less, was turned over to the trustee. In the meantime the sales, as nearly as could be estimated from the bank deposits and claimed expenditures, no books having been kept, aggregated but about $4,700, including the profits. The bankrupts could give no explanation whatever of the shortage, of more than $3,400, which arose during such short time: but there was testimony that goods had been removed from the store at night, and after the bankruptcy a store containing similar goods was started in another town in the name of the wife of one of the bankrupts, and conducted by them. *Held*, that such evidence warranted a finding that the goods unaccounted for were concealed by the bankrupts and an order requiring them to turn the same over to their trustee.

In Bankruptcy. On certificate of James Smitham, referee, sur rule on bankrupts to turn over property.

Frank N. Decker, for trustee.

Frank P. Sharkey and W. G. Thomas, for bankrupts.

ARCHBALD, District Judge. These are proceedings to compel the bankrupts to turn over certain property which it is claimed that they fraudulently conceal and keep back from their trustee. The referee has found that this is the fact, and the case now comes up on objections to his report. The legal points involved have been fully discussed recently by this court in the Lesaius Case, 163 Fed. 614, and it will not be necessary therefore to go over them. The only question is as to the facts.

E. I. Fidler & Son were adjudged bankrupts on their own petition in this court May 29, 1907. At the time of their failure they were engaged in the general clothing and men's furnishings business in Mauch Chunk, Pa.; Morris Fidler, the son, being the active manager.

They turned over to the trustee the stock of goods in their store, which they scheduled at $8,000, with $1,000 of store fixtures, all of which was subsequently sold by the trustee at public sale for $3,000; the referee finding that it was worth $5,000.

It is claimed on behalf of the bankrupts that it should be rated in the present accounting at from $10,000 to $12,000, on the theory that at a forced sale only one-third of the value is supposed to be realized. But it is expressly testified by Morris Fidler that it was not worth over $5,000, the amount fixed by the trustee, which puts the matter beyond controversy.[1] No books were kept by the bankrupts, and no inventory had been made for over two years; the only means taken to keep track of the business being the invoices or bills for goods purchased. According to these, as found by the referee, there was bought between March 1, 1907, and May 29th following, the date of bankruptcy, goods and merchandise to the amount of $8,115.62, which added to the stock of goods on hand at the beginning of this period, which was also estimated by Morris Fidler to have been about $5,000, makes $13,115.62 to be accounted for.

Against this, in order to get at what has become of them, there is to be credited the sales made during the time covered, which as evidenced by the deposits in bank amounted to $3,845.58. The running expenses for the same time, including the money drawn out by the bankrupts to live on, are figured by their counsel at $1,794. This is a somewhat liberal estimate, and not altogether to be gathered from the evidence. But, accepting it as being about as near as we can come to it, it represents so much more to be credited to sales, except that during this time the bankrupts borrowed $700 from Mrs. Esther Fidler, the wife of E. I. Fidler, the father, and $250 from other sources, which, having gone into the business, is to be charged up against the bankrupts in this accounting, or, perhaps better, deducted from the amount allowed for expenses, which it may be assumed that it went to meet, reducing by so much that which is to be credited as realized from sales. The net result of this may be tabulated as follows:

The bankrupts are to be charged with:
Goods on hand March 1st, as estimated................ $5,000 00
Merchandise received from March 1st to the date of
    bankruptcy, as shown by invoices.................... 8,115 62

                                                   $13,115 62

They are to be credited with:
Sales made, as evidenced by bank deposits............ $3,845 58
Expenses paid out of the business, $1,794, less $950 borrowed money..................................... 844 00

                                                   4,689 58

                                                  $8,426 04

---

[1] "By Mr. Sharkey, bankrupts' attorney: Q. In the speed and hurry of making up the value of your stock and contents of your store, you gave me the value at $9,000. Since then you have made an examination of the store and contents? A. Yes, sir. Q. And what is your opinion of the value of it since the latter examination? A. I do not think it more than about $5,000."

Or, in other words, they should have had $8,426.04 worth of goods to turn over to their trustee, instead of $5,000, leaving $3,426.04 unaccounted for. This is $750 less than was found by the referee, owing to the correction in the amount of money borrowed; but otherwise it follows his report.

The bankrupts have absolutely no explanation to offer for this large discrepancy. Their attention being called to it, that was the express answer which they gave. They admittedly experienced no loss by theft, nor by fire, and, doing a cash, and not a credit, business, as they claim, they had no bad debts, if any could have accumulated in the short time in question. Indeed, they even go so far as to say that they did not know that they were insolvent, and only went into bankruptcy because suits were being brought against them. But $8,000 worth of goods, obtained inside of three short months, if their bills are to be relied on, are not to be disposed of upon any such convenient lack of knowledge. They certainly could not have disappeared through the ordinary and legitimate channels without leaving some trace behind them.

It is said that the dates on the bills cannot be taken as evidence of when the goods were received; it being the custom of the trade to date them ahead, in fixing the terms of credit, the goods being forwarded meanwhile. But this is not true universally, and, if it applied to any specific bills, the bankrupts should have shown it. Indeed, the matter having been called to the notice of Morris Fidler, he testified that with one exception, which he named, where the goods were returned, and so do not figure here, they were all received subsequently to the dates in the invoices. It is further said that some of the bills do not show when the purchases were made, that in others the dates are after bankruptcy, while in others there should be corrections. There is one bill for advertising, $9, which, of course, does not represent goods; and another, for patterns, is $8.78 more than it should be. The two amount to $17.78, and this will be deducted. But with regard to the rest there seems to be no valid objection. The dates which are after bankruptcy, of which there may be one or two, may be examples of postdating such as is alluded to. But the bankrupts certainly do not deny that they got these goods before they failed, and, if so, they are chargeable with them, however they may have been billed. And as to those which are said to bear no date at all, the claims proved from which the amounts are taken were not sent up by the referee, and I have no means, therefore, of determining the truth about them.

It is said, again, that the stock on March 1st was made up of old goods, on which there was a large depreciation, which has not been allowed for. But the value taken is that which was put on them by Morris Fidler, which he expressly declared was rather more than less than that of those which were turned over to the trustee at the end, which he also fixes at $5,000, and this effectually disposes of any such question. Besides that, in crediting the sales, the goods are taken as though disposed of at cost prices, without considering the profits upon them, which, according to the bankrupts, would run any-

where from 25 to 33⅓ per cent. The trustee complains of this, and asks that the amount found due shall be increased accordingly. But this is an uncertain problem to enter on, and whatever corrections there should be on account of it may be set off against what should possibly be allowed because of old stock, thus doing justice to the rival contentions.

There is direct evidence, also, to sustain the charge of a disappearance or spiriting away of goods. William Conley, a borough policeman, whose duty it is to patrol the streets and try the store doors to see that they are fastened, at the same time inspecting the interiors through the windows, says that he noticed that the Fidler store was getting empty; and along the last of May, about a quarter to 5 one morning, he saw Sam Levin, an intimate friend of the Fidlers, a junk dealer, drive in the direction of the store with a wagon load of trunks, and half an hour afterwards come back again with them and drive off towards East Mauch Chunk, where he was doing business. And William Kistler, a watchman at the Mauch Chunk National Bank, confirms this. On another occasion, also, about 6 o'clock one morning in May, two weeks before the bankruptcy, C. A. Rex, who had a store next door to the Fidlers, saw Morris Fidler and Sam Levin loading up a wagon full of boxes, which looked like shoe boxes and were handled by them as though they were filled. It was daylight, but was an hour before the store was usually opened. Furthermore, on May 3d, the bankrupts bought a bill of umbrellas and parasols, from Siegel, Rothschild & Co. of Baltimore, Md., 254 articles, out of which only 81 were to be found in the stock turned over to the trustee, 173 being unaccounted for, an altogether improbable number to have been sold by one firm, in a place of the size of Mauch Chunk, in the short period before they went into bankruptcy. It is also a circumstance that the same kind of a store was started up not long afterwards at Lansford, a few miles from Mauch Chunk, in the name of Esther Fidler, in which E. I. Fidler signs the checks the same as before, and Morris Fidler is again the active manager.

The referee alludes to other matters which he considered significant, but it is not necessary to dwell upon them. Taking into consideration the things which have been referred to, in connection with the discrepancy in the stock which is disclosed by the figures, there is no escape from the conclusion that the bankrupts have made away with the goods which are unaccounted for, and, if so, they must now produce them. This applies to E. I. Fidler, the father, as well as Morris Fidler, the son, both being equally responsible; it being inconceivable that the one could have abstracted and concealed such a large quantity of goods without the other knowing and participating in it. The referee was therefore right in the order which he made, and it will be sustained, merely reducing the amount of it.

Let an order be drawn requiring the bankrupts to turn over to their trustee, within 10 days, goods and merchandise, late a part of their store stock, to the value of $3,400.